**OVERSTREET ELECTRIC CO., INC., Plaintiffs,**

**v.**

**The UNITED STATES of America, Defendant,**

**and**

**Wallace L. Boldt General Contractor, Inc. Defendant–Intervenor.**

**No. 03–2510C.**

United States Court of Federal Claims.

Dec. 19, 2003.

Michael H. Payne, Starfield & Payne, Fort Washington, Pennsylvania, argued for the plaintiff.

Arlene P. Groner, Commercial Litigation Branch, Civil Division, United States Department of Justice, argued for the defendant.

Kevin M. Warburton, The Gardner Law Firm, San Antonio, Texas, argued for the defendant-intervenor.

## OPINION AND ORDER

BLOCK, Judge.

This is a post-award bid protest case filed under the Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996)(ADR), which amended the Tucker Act to provide the Court of Federal Claims with post-award bid protest jurisdiction. 28 U.S.C. § 1491(b)(1)-(4)(2000). Before the court are the parties' cross-motions for summary judgment on the administrative record pursuant to Rule 56.1 of the Rules of the Court of Federal Claims (RCFC) and plaintiff's petition for an injunction pursuant to RCFC 65. Oral argument was held in Washington, D.C. on November 12, 2003.[1]

Overstreet Electric Company, Inc. ("Overstreet") submitted the lowest final bid on a construction contract solicited by the United States Air Force ("USAF") for the repair and possible replacement of a medium voltage switching station at Randolph Air Force Base ("Randolph AFB"), San Antonio, Texas. Although Overstreet submitted the lowest bid, the Air Force evaluator determined that Overstreet's bid did not provide the best value, and awarded the contract to defendant-intervenor Wallace L. Boldt General Contractor, Inc. ("Boldt") because Boldt's past job performances were graded higher than Overstreet's.

Overstreet contends it submitted a bid $201,118 lower than Boldt's and, therefore, the USAF acted arbitrarily and capriciously in awarding the contract to its higher-priced competitor. Both Boldt and the government counter that the solicitation expressly required the USAF to award the contract not to the lowest-priced bidder, but to the bidder

with the greatest past performance rating. This rating was to be based on a review of both the quality and relevancy of the bidder's past jobs (with "relevancy" defined as the similarity of past jobs to the bid job). These parties conclude that the USAF's award to Boldt was justified because the USAF rated Boldt at a higher performance level than Overstreet.

Overstreet's rejoinder is that the USAF misconstrued its own solicitation standards. According to Overstreet, the solicitation required that while prime contractors may submit for review prior relevant jobs performed by subcontractors it intends to employ on the Randolph AFB contract, relevant prior jobs performed by prime contractors *qua* prime contractors weighed more heavily in the solicitation than relevant jobs performed by subcontractors. Thus, Overstreet argues, its past performance level warranted a higher grade than Boldt's because while Boldt submitted relevant jobs performed by subcontractors, Overstreet submitted relevant prior jobs it completed as a prime contractor. Be that as it may, Overstreet further maintains the award to Boldt was also irrational given the ten percent price differential between the bids and that its past performance rating was only marginally less than Boldt's. In other words, Overstreet alleges that while pricing may very well be of less importance than past performance, the way the USAF evaluated the respective bids virtually eliminated cost as a factor altogether.

As explained more fully below, Overstreet's arguments, while certainly not specious, misconstrue the plain meaning of the solicitation. The solicitation did not mandate giving greater weight to past relevant jobs performed by the bidder solely as a prime contractor. Nor did the solicitation require making a direct comparison amongst the bidders' submitted prior relevant jobs. Instead, it looked to various factors in formulating a past performance grade. It is these grades which determined the ranking of the bidders. Because of the national security implications

---

1. The opinion was issued under seal on December 15, 2003. The court afforded the parties an opportunity to propose redactions. The parties, however, suggested no such redactions and,

therefore, the court publishes the opinion and order in its original form (with some minor corrections).

relating to the training carried out at Randolph AFB, the USAF explicitly designated past performance and quality control, not pricing, as most important to the USAF in the solicitation. In this circumstance, and upon review of the administrative record, the court cannot say as a matter of law that the USAF's grant of the Randolph AFB contract to Boldt was arbitrary and capricious.

This court may not have drafted the solicitation in the same manner as the Air Force. Arguably, there are more just ways to protect the Air Force's interests. It is also clear that the language employed in this solicitation could be improved. But it is well to remember Winston Churchill's characterization that "democracy is the worst form of government except all those other forms that have been tried from time to time."[2] Almost as proof of this proposition, the Tucker Act and its 1996 amendment, which allow this court to entertain bid protests, produced many outcomes but not perfection. Truth be told, Congress did not design the legislation to afford the optimal outcome. To the contrary, its purpose was merely to provide judicial protection from gross agency excesses. In doing so, it strikes a balance between the need to give deference to agency expertise and the demand for fairness to bidders and the public at large. The law, consequently, does not allow this court to second guess governmental agencies. As such, given the facts in the record and the near draconian standard of review, this court grants summary judgment in favor of the government and denies plaintiff's cross motion and petition for injunctive relief.

## I. Background

The relevant facts of this case derive from the administrative record. Randolph AFB is home to the Air Force Personnel Center, the Air Training Command Headquarters, Air Force Recruiting Service Headquarters, and the Nineteenth Air Force Headquarters. Admin. R. at 752. On August 1, 2003, the USAF issued a Request for Proposals, identified as Solicitation No. F41691–03–R0019, which sought offers on a project to repair or replace the main base switching station at Randolph AFB. The main base switching sta-

tion feeds four other on-base switching stations, each of which can supply power to the entire base. The USAF designed this project to upgrade the electrical infrastructure required to support the Air Education and Training Command mission at Randolph AFB.

The USAF solicited bids pursuant to the negotiated method of procurement whereby a final contracting plan must be negotiated between the offering business concern and the procuring department, the USAF. The final negotiated plan then becomes a material part of the contract. Admin. R. at 11; 48 C.F.R. 15.000, 15.3, 15.406–3. The USAF amended the solicitation six times. Admin. R. 45–148s. While proposals were originally due on September 2, 2003, the USAF extended the deadline to September 17, 2003. *Id.* at 148r.

The USAF specified this solicitation as a "competitive best value, single award acquisition utilizing Performance Price Trade-off (PPT) procedures." *Id.* at 62. This process permitted the selection authority to favor non-cost factors ahead of cost or price in selecting a particular offeror for the contract. *See* 48 C.F.R. 15.101–1(c) (2003). Section M of the solicitation, entitled EVALUATION CRITERIA, specified the criteria to be used in evaluating and ranking the bids. This section defines the criteria of "best value" as the:

> most advantageous offer, price and other factors considered, consistent with the Government's stated importance of evaluation criteria. This may result in [an] award being made to a higher-rated, higher priced offeror when the Contracting Officer determines that the past/present performance of the higher-priced offeror outweighs the price difference. To arrive at a best value decision, the Contracting Officer will integrate the evaluation of past performance and price.

Admin. R. at 62.

Paragraph I of Section M of the solicitation advised all offerors that "[p]ast performance is significantly more important than price," and that the solicitation authority would:

---

2. Winston Churchill (1874–1965), Hansard, November 11, 1947.

(a) evaluate an offeror's Present/Past Performance using the descriptive adjective that most accurately defines the offeror's performance.

(b) make a "Best Value" determination considering an offeror's past/present performance and total proposed price for the project.

(c) evaluate an offeror's Subcontracting Plan (applicable to large businesses) and make a responsibility determination.

*Id.* at 63.

Paragraph I(c) of Section L required offerors to identify exceptions to any of the requirements of the solicitation in an Addendum to its proposal clearly labeled "Exceptions," and stated that "[t]he Government will assume an offeror takes no exceptions to any solicitation requirement if the offeror does not submit an Addendum identifying exceptions." *Id.* at 59.

Paragraph II of Section M, meanwhile, detailed methods the USAF's contracting and evaluating officer, or "Source Selection Authority" (SSA), would employ in collecting information concerning an offeror's past performance. These methods included questionnaires completed by an offeror's references, independently obtained data, the USAF's personal business experience with the offeror, and any information the offeror submitted that explained specific problems the offeror encountered on previous contracts as well as any of the offeror's corrective actions. *Id.* at 63, para. II(b). The solicitation also identified five performance subfactors the SSA must use in assessing an offeror's past performance. These subfactors included: (1) quality control, (2) timely performance, (3) management effectiveness, (4) compliance with labor standards, and (5) compliance with safety standards. Of these subfactors, the USAF viewed quality control as the most important. *Id.*, para. II(e).

Paragraph II(g) of Section M contained three parameters for offerors' bids and references—currency, relevancy, and performance. First, as to "currency" (which in the sometimes arcane jargon of the Air Force means "timeliness" rather than the more common unit or means of monetary exchange) the USAF placed the greatest weight on an offeror's jobs completed within three years of August 1, 2003. The USAF placed "little or no weight" on any submitted past performance falling outside of that time period. *Id.* Second, concerning the elements of both "performance" and "relevancy," the solicitation mandated that past performance on "highly relevant" projects carried greater weight in the evaluation. Significantly, Paragraph II(g) provided the following guidelines concerning the term "relevancy":

> In determining relevancy, the government will compare the offeror's references for similarity of construction methods and scope (size and complexity) to the Repair/Replace Main Switching Station project. Relevancy will be evaluated based on successful performance in the construction of medium voltage switch gear and distribution systems or other similar electrical projects.

*Id.* at 64, para. II(g).

It is also highly material to our case that the solicitation allowed offerors lacking in relevant experience to use subcontractors to perform even the critical relevant aspects of this project. To assure project viability, however, the solicitation required offerors lacking relevant present or past performance experience to submit three references for each subcontractor the offeror intended to employ on this project. *Id.* at 60, Section L, para. III(c). The USAF wanted this information to conduct performance evaluations on such "key subcontractors." *Id.*

At a minimum, the solicitation mandated the offeror to submit for each key subcontractor a brief synopsis of relevant experience and three references. *Id.*, Section L, paras. III(c)(1), (2). The solicitation enhanced this requirement if the offeror intended the key subcontractor to perform the electrical work required to install the medium voltage system. *Id.*, para. III(d). In such a case, the solicitation obligated the offeror to "identify at least three, but no more than six, of the most relevant contracts performed for Federal, State, and local agencies and commercial customers within the last 3 years." *Id.* at 59, Section L, para. III(a).

The controversy in the case at bar primarily derives from the interpretation of the language contained in Paragraph II(g) of Section M, which provided that an offeror's past performance as a prime contractor carried more weight than its prior work as a subcontractor. ("Performance by the offeror as a prime contractor will be considered more relevant than performance as a subcontractor.") *Id.* at 64. Furthermore, the final sentence of this paragraph mandated that the SSA must weigh work performed by the offeror in its present business form more heavily than jobs done by its predecessor companies, chief employees, or even by its major subcontractors. ("Also, performance by the offeror under it's [sic] current business structure will be considered more relevant than performance by predecessor companies, key personnel, or key subcontractors.") *Id.*

Once the SSA assessed the past performance of either an offeror or an offeror's subcontractor—in the context of currency, relevancy, and whether the particular offeror was acting as a prime or subcontractor, as well as taking into account the five performance subfactors—the SSA assigned a grade that ranked the offeror's past performance. *Id.* at 63. These scoring gradations were as follows: "Exceptional, Very Good, Satisfactory, Neutral, Marginal, and Unsatisfactory." *Id.* at 64. The SSA assigned an "Exceptional" rating if "[b]ased on the offeror's performance record, essentially no doubt exists the offeror will successfully perform the required effort." The SSA awarded a rating of "Very Good" if "[b]ased on the offeror's performance record, little doubt exists that the offeror will successfully perform the required effort." *Id.* It is highly significant that the solicitation put the offerors on notice that "[w]hile the Government and the Contracting Officer will strive for maximum objectivity, *the evaluation process, by its nature, is subjective and therefore, professional judgment is implicit throughout the entire evaluation process.*" *Id.* at 63 (Emphasis added).

On September 12, 2003, Overstreet was one of seven offerors that submitted bids in response to the solicitation. Along with its bid, Overstreet provided six references illus-trating its experience as a prime contractor on projects such as replacing medium and low voltage distribution systems, upgrading and installing power transformers, and constructing new electrical substations. *Id.* at 288–99. Overstreet estimated its total cost for the Randolph AFB project as $1,974,532. *Id.* at 752.

Boldt, on the other hand, submitted a bid including a list of 12 subcontractors it intended to use on the Randolph AFB project, two of whom were electrical subcontractors. *Id.* at 258. Boldt's references accounted for its performance as a prime contractor on projects such as constructing a flight operations facility, a telecommunications security and training building, as well as electrical distribution work. *Id.* at 236–39. In addition to its own required references, Boldt also submitted five references for each of its two electrical subcontractors. *Id.* at 241, 243. Boldt estimated its total cost for the Randolph AFB project as $2,175,650. *Id.* at 752.

After evaluating all of the bids, the SSA published the offerors' evaluations and the ultimate awarding decision in a memorandum dated September 30, 2003. *Id.* at 752. This memorandum, called the Source Selection Decision Document ("SSDD"), detailed the SSA's analysis of each offeror and the subsequent best value determination in favor of Boldt. *See Id.* at 745–52. Specifically, the SSDD documented the SSA's integrated assessment of each offeror, and how that translated into a lower past performance rating for Overstreet than Boldt. *See Id.* at 746–750.

In the SSDD, the SSA analyzed each offeror by first stating the offeror's overall past performance grade. The SSA then identified the number of relevant projects she used to assess the offeror's past performance, and how the offeror performed on those past contracts in the context of the Paragraph II(e) performance subfactors. Next, the SSA highlighted any other performance considerations (*i.e.,* letters of recommendation, certificates of achievement, personal experience with the particular offeror) used in the evaluation of an offeror's past performance. Finally, the SSA summarized the projects

evaluated for each offeror's performance grade. *Id.*

The SSA awarded Overstreet an overall "Very Good" rating based on Overstreet's performance of four prior relevant jobs. *Id.* at 746. Although Overstreet submitted six prior projects for review, the SSA narrowed that field down to the four most relevant jobs, and then placed the greatest weight with the three most current projects. In two of these four projects, Overstreet warranted a "very good" in quality control, as well as a "satisfactory" and an "exceptional" in the other two. *Id.* The SSA also considered Overstreet's safety award and Certificate of Achievement from the Army Corps of Engineers as evidence of its favorable past performance. *Id.*

Boldt, on the other hand, received an "Exceptional" overall grade based on the SSA's assessment of Boldt's past performance of three prior relevant jobs. *Id.* at 747. The SSA narrowed the analysis to Boldt's three most relevant past projects, and placed the greatest weight with the two most current jobs. In each of these three contracts, Boldt received an "exceptional" in quality control. *Id.* Boldt also submitted for the SSA's consideration numerous letters of appreciation from commercial contract customers as well as the Army Corps of Engineers. *Id.*

The SSA's evaluation, however, did not encompass only Boldt's own past performances. Because Boldt proposed to complete the Randolph AFB project in its capacity as a prime contractor employing various subcontractors, the SSA evaluated Boldt's two electrical subcontractors ("B1" and "B2") in the same manner as Boldt and Overstreet. *See Id.* at 747–48. As done with Overstreet and Boldt, the SSA narrowed the subcontractors field of past projects to the most relevant and current projects as defined by Paragraph II(g). While not assigning an overall performance grade to Boldt's subcontractors, the SSA noted that B1 received two "exceptional" ratings and a "very good" rating for quality control. B2, furthermore, received two "exceptional" quality control grades on its two referenced projects. *Id.* at 747.

After completing all the offerors' past performance evaluations, the SSA then ranked the offerors according to their proposed prices. *Id.* at 751. Overstreet and Boldt were the top two ranked offerors because they submitted the lowest priced offers. The SSA, in a paragraph entitled "Trade-off Analysis," then compared all the offerors using their performance grades and proposed prices. *Id.* Based on this information, the SSA narrowed the pool of possible awardees from six contractors to two: Overstreet and Boldt. The SSA selected Overstreet as the lowest-priced offeror and Boldt as the highest-rated offeror with the lowest price. *Id.* The SSA observed that awarding Boldt the Randolph AFB contract "will result in an additional cost to the Government of $201,118," and conducted a trade-off analysis to determine if it was in the USAF's best interest "to pay an extra 10 percent more in order to award to an exceptional performer." *Id.*

In the trade-off analysis, the SSA considered the critical importance of the project to the multiple missions the USAF performs at Randolph AFB. *Id.* at 752. The SSA acknowledged that while Boldt did not plan by itself to perform the project, it "successfully managed projects involving multiple trades, and has worked successfully with its key subcontractors on similar projects in the past." *Id.* at 751. The SSA found that Boldt's performance record using subcontractors mitigated any of the USAF's potential concerns regarding subcontracted work. *Id.* at 751–52. In light of this finding, the SSA awarded the contract to Boldt citing its "Exceptional" performance grade, Boldt's superior management skills, and the USAF's concern for preserving an uninterrupted source of electricity to Randolph AFB. *Id.* Boldt, the SSA reasoned, provided the USAF with "the highest level of confidence that the Switching Station project will be completed in a problem-free manner." *Id.* at 752. The SSA thus concluded that the price premium of approximately 10 percent was justified in order to obtain the "highest possible level of assurance that the project will be completed successfully." *Id.*

On October 3, 2003, the USAF notified Overstreet that Boldt received the Randolph AFB contract. Overstreet promptly request-

ed a "debriefing" that explained why the government did not award Overstreet the contract. On October 17, 2003, the USAF convened the debriefing at Randolph AFB. Mr. Benjamin Overstreet, President of Overstreet, attended the meeting. *Id.* at 864. At this meeting, the USAF provided Mr. Overstreet a redacted copy of the SSDD. *Id.* At this point, Overstreet learned that the SSA assigned it a grade of "Very Good" and graded Boldt as "Exceptional." *Id.* at 864–65.

Mr. Overstreet expressed several concerns relating to the solicitation's evaluation process and the SSA's ultimate decision. First, Mr. Overstreet challenged Boldt's and its subcontractors' relevant experience. Second, Mr. Overstreet questioned whether the government could justify the $201,118 "trade-off" (*i.e.,* the difference between Overstreet's lower bid and Boldt's higher bid) given the minimal difference between Boldt's "Exceptional" rating versus Overstreet's "Very Good" rating. *Id.* at 865. Third, Mr. Overstreet also argued that the SSA incorrectly excluded one of Overstreet's past projects as "outside the recency definition." *Id.* The USAF replied that it was unable to answer these questions and asked Mr. Overstreet to put his concerns in writing. *Id.*

On October 30, 2003, Overstreet filed a post-award bid protest and requested the following relief:

1. A temporary restraining order preventing the government from issuing Boldt a notice to proceed, or allowing Boldt to proceed with its performance on the contract.

2. A declaratory judgment that Boldt's past performance evaluation was arbitrary, capricious, and an abuse of discretion.

3. A declaratory judgment that the government's performance price trade-off lacked a rational basis and improperly resulted in the conclusion that the offer submitted by Boldt was the best value.

4. A preliminary and permanent injunction directing the government to rescind the award to Boldt and to reopen negotiations so that a proper and fair evaluation,

in accordance with the stated evaluation criteria, could be conducted.

Pl.'s Compl. at 7–8.

On October 31, 2003, this court conducted a telephone conference in which representatives of Overstreet, Boldt, and the government participated. In accordance with the Rules of the Court of Federal Claims (RCFC) Appendix C, this court established a briefing and hearing schedule to determine the merits of Overstreet's claims. This court, in an order dated October 31, 2003 and pursuant to RCFC 65(a)(2), consolidated the hearing for preliminary injunctive relief with the trial on the merits and denied Overstreet's request for a temporary restraining order as moot. Order Memorializing Initial Teleconference in Procurement Protest, October 31, 2003. The court also requested Overstreet and Boldt to submit motions for summary judgment in accordance with RCFC 56.1.

## II. Discussion

### A. *Jurisdiction and Standard of Review.*

Pursuant to RCFC 56.1, when deciding a motion for judgment on the administrative record, the inquiry is whether, given all the disputed facts, plaintiff has met its burden of showing that an award is arbitrary, capricious, or prejudicially violates applicable procurement regulations. *See CCL Serv. Corp. v. United States,* 48 Fed.Cl. 113, 119 (2000). When a case is before the court on cross-motions for summary judgment, such as the case at bar, each party must meet this standard. *Kanehl v. United States,* 38 Fed. Cl. 89, 98 (1997) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Inferences drawn from the evidence, in this case the administrative record, are viewed in the light most favorable to the opposing party. *Id.; Cincom Systems, Inc. v. United States,* 37 Fed.Cl. 663, 671 (1997).

Before the court is a post-award bid protest. The Tucker Act, 28 U.S.C. § 1491(b)(1) (2003), confers jurisdiction upon the Court of Federal Claims to entertain claims by a bid protestor challenging "the award of a contract or any alleged violation of statute or regulation in connection with a procurement

or a proposed procurement." Under this Act, the court evaluates the procuring agency's conduct to determine whether the government's conduct was arbitrary and capricious under the standards set forth in the Administrative Procedure Act (APA). *See* 28 U.S.C. § 1491(b)(4) (2003) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.").[3]

Regarding this standard, the Supreme Court stated that:

> Section 706(2)(A) requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted); *see also Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057–58 (Fed.Cir. 2000).

By its very definition, "this standard recognizes the possibility that there exists a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which 'consider[s] the relevant factors' and is 'within the bounds of reasoned decisionmaking.'" *PGBA, LLC v. United States,* 57 Fed. Cl. 655, 657 (2003) (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)). The court's inquiry, moreover, must focus on whether the agency "examined the relevant data." *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

■ To prevail under the arbitrary and capricious standard in bid protest cases, a frustrated bidder must establish that the government officials involved in the procurement process lacked a rational and reasonable basis for their decision. *See, e.g., Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.2003); *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed.Cir. 2001); *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir.1996). *See also Halter Marine, Inc. v. United States,* 56 Fed. Cl. 144, 156 (2003). Furthermore, "the arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1058 (Fed.Cir.2000) (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)); *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir.1989) (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971) ("If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it

---

**3.** Section 706 of Title 5, "Scope of review," provides:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall ...
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be–
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;

> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law;
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.")).

In a negotiated procurement, like the procurement in the case *sub judice,* contracting officers are generally afforded even greater decision-making discretion. *See LaBarge Prods., Inc. v. West,* 46 F.3d 1547, 1555 (Fed. Cir.1995) (*citing Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 65, 617 F.2d 590 (1980) ("Because of the breadth of discretion given to the contracting officer in negotiated procurement, the burden of showing this discretion was abused, and that the action was 'arbitrary and capricious' is certainly much heavier than it would be in a case of formal advertising.")); *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d 955, 958 (Fed.Cir. 1993); *ManTech Telecomm. & Info. Sys. Corp. v. United States,* 49 Fed.Cl. 57 (2001) ("a protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion.").[4] *In re General Offshore Corp.,* B–251969.5, B–251969.6, 94–1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 248, at 3 (Apr. 8, 1994) ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award. Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted).

■ Similarly, in *E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996) the United States Court of Appeals for the Federal Circuit offered guidance on the applicable standard of review in bid protest cases involving performance standards: Procurement officials have substantial discretion to determine which proposal represents the best value for the government. *See Lockheed Missiles & Space Co., Inc. v. Bentsen,* 4 F.3d 955, 958 (Fed.Cir.1993); *cf. Widnall v. B3H,* 75 F.3d 1577 (Fed.Cir.1996) (holding that Board of Contract Appeals should defer to agency's best value decision as long as it is "grounded in reason … even if the Board itself might have chosen a different bidder.").

■ An additional burden placed on plaintiff is the requirement of demonstrating prejudice.[5] *See* 5 U.S.C. § 706 ("due account

---

**4.** The court in *Sperry Flight Sys. Div. v. United States,* 212 Ct.Cl. 329, 339, 548 F.2d 915, 921 (1977) explained that because the contracting officer in a negotiated procurement alone is entrusted with contracting, greater deference must be afforded than would be in a case of formal advertising: "the decision to contract—a responsibility that rests with the contracting officer alone—is inherently a judgmental process which cannot accommodate itself to absolutes, at least not without severely impairing the quality of the judgment called for … effective contracting demands broad discretion."

**5.** Besides "prejudice," Overstreet technically must establish that it is an "interested party" for statutory standing purposes. Because a party losing a bid almost always falls under this standard, which is equated with an allegation of economic harm, there is sparse discussion of what an "interested party" is in bid protest cases. The requirement derives from the Administrative Disputes Resolution Act's amendment in 1996 of the Tucker Act (*see* Pub.L. No. 104–320, 110 Stat. 3870), which allows the Court of Federal Claims to render judgment only to an "interested party" in bid protest cases. *See* 28 U.S.C. § 1491(b)(1). Because this provision did not define "interested party," it was unclear whether section 1491(b)(1) incorporated the liberal standing requirement set forth in 5 U.S.C. § 702, or whether it adopted the slightly more restrictive standard set forth in the Competition in Contracting Act ("CICA"), 31 U.S.C. §§ 3551–56, for GAO review of bid protests. The Federal Circuit resolved this issue in *American Fed'n of Gov't Employees, AFL–CIO v. United States* 258 F.3d 1294, 1302 (Fed.Cir.2001), by holding that in light of the similarity of terms between 1491(b)(1) and CICA, the CICA standard applies to bid protest cases. CICA simply defines an "interested party" as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2) (2003). Clearly in this sense, Overstreet easily meets the standard of an interested party to the procurement in this case. Overstreet was one of six finalists for the Randolph AFB contract. Overstreet submitted the lowest bid and documented its previous experience with building electrical switching stations. When the USAF awarded the contract to Boldt, Overstreet suffered an immediate loss of not only its bid preparation costs, but also any anticipated profits under the contract. *See Myers Investigative*

shall be taken of the rule of prejudicial error"). In order to prevail in a bid protest, the protestor must show not simply a significant error in the procurement process, but also that the error was prejudicial. *See Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir.1996); *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." *Data Gen.,* 78 F.3d at 1562. Rather, the protester must show "that there was a *substantial chance* it would have received the contract award but for that error" in the procurement process. *Info. Tech.,* 316 F.3d at 1319 (citing *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999)) (emphasis added). The "substantial chance" standard has also been characterized as a "reasonable likelihood" of success but for the alleged error. Thus, in *Data General,* the Federal Circuit held that:

> We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract .... The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances.

*Data Gen.,* 78 F.3d at 1562. *See also CACI, Inc.-Fed. v. United States,* 719 F.2d 1567, 1574–75 (Fed.Cir.1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, " 'there was a substantial chance that [it] would receive an award—that it was within the zone of active consideration.' ") (citation omitted). The court, furthermore, must address the issue of prejudice before deciding the merits because prejudice goes directly to the question of standing. *Info. Tech.,* 316 F.3d at 1319 *and Security Servs., Inc. v. United States,* 275

("[B]ecause the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.").

### B. *Standard of Review for a Request for Injunctive Relief.*

■ This court must also decide whether to grant an injunction directing the government to rescind the award to Boldt and to reopen negotiations for a new award of the Randolph AFB contract. Courts interfere with the government's procurement process only in extremely limited circumstances. *Banknote Corp. of America, Inc. v. United States,* 56 Fed.Cl. 377, 380 (2003). Although this court now decides whether to grant Overstreet's request for a permanent injunction, the standards for granting such relief are virtually similar to the standards for preliminary injunctions. *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542, (1987) (standard for permanent injunction is essentially same as temporary injunctions, except actual success replaces need to show likelihood of success on merits).

Overstreet recognizes that, to obtain injunctive relief, it must demonstrate that:

(1) it actually prevailed on the merits of its underlying claim;

(2) it will suffer irreparable injury if this court does not grant an injunction;

(3) the harm it will suffer if the injunction is not issued outweighs the harm to the United States and third parties; and

(4) granting the injunction does not harm the public interest.

Pl.'s Mem. of P. & A. in Supp. of Mot. for T.R.O., Prelim. Inj., Perm. Inj. and Decl. Relief at 13 citing *Washington Metro. Area Transit Comm'n v. Holiday Tours,* 559 F.2d 841 (D.C.Cir.1977); *Virginia Petroleum Jobbers Assn. v. Federal Power Comm'n,* 259 F.2d 921 (D.C.Cir.1958). *See also ABF Freight,* 55 Fed.Cl. at 396; *Bean Stuyvesant, L.L.C. v. United States,* 48 Fed.Cl. 303, 320–21 (citing *Hawpe Constr., Inc. v. United States,* 46 Fed.Cl. 571, 582 (2000)); *Cincom,* 37 Fed.Cl. at 268.

F.3d 1366, 1370 (Fed.Cir.2002).

Overstreet must satisfy each of these tests by clear and convincing evidence. *ABF Freight,* 55 Fed.Cl. at 396; *Cincom,* 37 Fed. Cl. at 268; *Bean Dredging Corp. v. United States,* 22 Cl.Ct. 519, 522 (1991).

## C. *The Parties' Contentions.*

Overstreet advances two principal arguments in support of its contention that the SSA acted arbitrarily and capriciously. First, Overstreet asserts the SSA erroneously awarded Boldt an "Exceptional" rating that led to Boldt receiving the Randolph AFB contract. Overstreet claims to have submitted far more relevant past projects than Boldt's two and that the evaluation standards in the solicitation were not followed by the Air Force evaluator. *See* Mem. in Supp. of Pl.'s Cross–Mot. for Summ. J. at 11–20. Second, Overstreet maintains that the SSA's trade-off analysis was flawed because there was no meaningful difference between Boldt's "Exceptional" and Overstreet's "Very Good" ratings that warranted a $201,118 difference in price. *See Id.* at 20–37.

The government responds by attempting to shield the Air Force behind the almost impenetrable armor of the heightened standard of review in these bid protest matters. "Review of Overstreet's challenge to the [SSA's] evaluation of Boldt's past performance should be limited to determining whether the [SSA's] evaluation of Boldt was reasonable and consistent with the stated evaluation criteria." Def's. Mot. for J. on the Admin. R. at 15. The government disputes Overstreet's claim that Boldt furnished information about only two current projects. "The record reveals unambiguously that Boldt's proposal included performance information for six projects, [Admin. Rec. at 236–39], and also identified five projects of each of its proposed electrical subcontractors. [Admin. Rec. 241, 243]. Thus, there is no basis for Overstreet's claim ... that the [SSA] failed to enforce the requirements of the Solicitation." *Id.* at 15–16.

The government then takes the offense by bombarding Overstreet's relevancy arguments with the characterization that they are nothing more than mere disagreements with the SSA's conclusions, as opposed to an alleged departure from the terms of the solicitation. *Id.* The government asserts that Overstreet's claims are, therefore, infirm because in reality they constitute an impermissible facial attack on the terms of the solicitation.[6] *Id.* at 9–14. The government invokes the "patent ambiguity rule" and maintains that these sorts of facial protests must be brought prior to the award of the contract. *Id.* at 10 (citing *Halter Marine, Inc. v. United States,* 56 Fed.Cl. 144, 169 (2003); *Newsom v. United States,* 230 Ct.Cl. 301, 676 F.2d 647, 649 (1982)). Consequently, the government argues, Overstreet waived its rights to protest the facial terms of the solicitation because Overstreet failed to challenge these terms in an addendum to its offer before the SSA awarded Boldt the Randolph AFB contract.[7] *Id.;* Tr. of Oral Arg. at 76:22–25.

6. Specifically, the government enumerates these facial challenges to the solicitation to include that:

 (1) there is little meaningful difference between the exceptional and very good ratings, Def.'s Mot. for J. on the Admin. R. at 11 (citing Pl.'s Mem. of P. & A. in Supp. of Mot. for T.R.O., Prelim. Inj., Perm. Inj. and Decl. Relief at 2)

 (2) the projects of competing offerors should be compared instead of projected imputed to an offeror through a subcontractor, *Id.* (citing Pl.'s Compl., para. 28; Pl.'s Mem. of P. & A. in Supp. of Mot. for T.R.O., Prelim. Inj., Perm. Inj. and Decl. Relief at 2)

 (3) the preference should be accorded to an offeror that would perform the entire project over an offeror that proposes to use subcontractors, *Id.* (citing Pl.'s Mem. of P. & A. in Supp. of Mot. for T.R.O., Prelim. Inj., Perm. Inj. and Decl. Relief at 3)

 (4) an offeror should be required to demonstrate a prior working relationship with its proposed electrical subcontractors, *Id.* (citing Pl.'s Compl., para. 27; Pl.'s Mem. of P. & A. in Supp. of Mot. for T.R.O., Prelim. Inj., Perm. Inj. and Decl. Relief at 8)

 (5) the SSA should award the contract to the offeror with the lowest-priced, technically-qualified bid. *Id.* (citing Pl.'s Mem. of P. & A. in Supp. of Mot. for T.R.O., Prelim. Inj., Perm. Inj. and Decl. Relief at 3).

7. The government notes that the solicitation, as part of a negotiated procurement, explicitly requires that an offeror:

 shall clearly identify each such exception and include a complete explanation of why the

In rejoinder, Overstreet parries the government's "waiver" argument by vehemently denying that Overstreet assaults the very terms of the solicitation. Instead, Overstreet characterizes its position as simply that the SSA irrationally failed either to apply or to adhere to the procedures and definitions contained in the solicitation, all in violation of the APA section 706 standards incorporated in the bid protest statutory provision of the Tucker Act, 28 U.S.C. § 1491(b)(4) (2000). Tr. of Oral Arg. at 12: 7–25, 13: 1–7.

Overstreet's primary counterattack is its contention that it likely would have received the Randolph AFB Contract but for the SSA's failure to abide by the standards set forth in the solicitation. Overstreet characterizes itself as the rightful recipient of the award because Overstreet provided the best performance/price trade-off. Given the more than ten percent price differential between its lower bid and Boldt's higher one, coupled with the fact that the SSA graded Overstreet's past performance rating only marginally less than Boldt's, Overstreet maintains that its bid provided the USAF with the best performance at the lowest cost; in other words, the best "bang for the buck." [8]

### D. *Was Overstreet Prejudiced by the Award?*

As stated, before reaching the merits of Overstreet's claims, this court must initially address the threshold issue of whether Overstreet demonstrates that it was "prejudiced" by the award to Boldt. *Info. Tech.,* 316 F.3d at 1319. In other words, did Overstreet show "that there was a substantial chance it would have received the contract award but for that error" in the procurement process? *Id.* (citing *Alfa Laval Separation,*

*Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999)).

As to the prejudice requirement, the government asserts that Overstreet failed to demonstrate that it had a substantial chance to win the award because two other bidders besides Boldt also received an "Exceptional" rating. Def.'s Mot. for J. on the Admin. R. at 24; Tr. of Oral Arg. at 91: 11–25, 92: 1–15. Thus even eliminating the Boldt bid from the fray, the government argues, the SSA likely would have selected one of the two other "Exceptional" offerors over a "Very Good" Overstreet because of the critical nature of the project and the USAF's consequent vital need to minimize the risk of power failure. *Id.;* Tr. of Oral Arg. at 89: 13–25, 90: 1–10.

Overstreet counters by reiterating that under the best performance/price trade-off requirement, it and not Boldt likely would have been awarded the contract. In direct response to the government's point that the two runner-up offerors also had "Exceptional" ratings to Overstreet's "Very Good," Overstreet contends that those bids were proffered with significantly higher cost estimates than theirs and, therefore, suffer from the same best performance/price trade-off problem plaguing Boldt's offer. Tr. of Oral Arg. at 38:6–14. Overstreet also emphasizes that two of the other remaining offerors had either "Neutral" or "Very Good" ratings, in which case Overstreet should have won the award because it had a "Very Good" rating and offered the lowest price. Accordingly, Overstreet argues that it clearly demonstrated prejudice because under the terms of the solicitation, awarding the project to a lower performing/higher priced offeror, or a higher performing/substantially higher priced offer-

---

exception was taken and what benefit accrues to the Government. All exceptions ... and supporting rationale shall be included in an Addendum to the proposal clearly labeled 'Exceptions' ... The Government will assume an offeror takes no exceptions to any solicitation requirement if the offeror does not submit an Addendum identifying exceptions.

Def.'s Mot. for J. on the Admin. R. at 10 (citing Admin. R. at 59, para. I(c)).

8. Another way to characterize Overstreet's argument is in terms of the SSA's failure to consider

a relevant factor. In other words, according to Overstreet, the award to Boldt was wholly irrational because, while pricing may very well be of less importance than past performance in the solicitation, the way the SSA evaluated the respective bids virtually eliminated cost as a factor altogether. *See* 5 U.S.C. § 706(2). *See also Baltimore Gas & Elec. Co.,* 462 U.S. at 105, 103 S.Ct. 2246 (an evaluator must "consider the relevant factors ... within the bounds of reasoned decisionmaking.").

or would not yield the best value to the government. Tr. of Oral Arg. at 38:15–23.

While expressing some doubt at oral argument as to its showing of prejudice, upon reflection, the court now agrees that Overstreet hurdled this obstacle.[9] This is because a finding of prejudice must be based not on the ultimate merits of the case, but on the allegations of error. *See Info. Tech.*, 316 F.3d at 1319. *See also Data Gen.*, 78 F.3d at 1562. Indeed, the Federal Circuit in *Information Technology* reversed the Court of Federal Claims for "not decid[ing] the question of prejudice, because it [first] determined that there was no error in the procurement process . . . ." *Id.* Clearly then, the court must consider whether given the alleged error "there was a substantial chance" that Overstreet "would have received the contract award." *Id.* In other words, was Overstreet's bid "within the zone of active consideration?" *CACI, Inc.*, 719 F.2d at 1574–75. The answer to both inquiries is plainly yes.

The SSA's decision to consider Overstreet's bid as one of the last two potential awardees indicates that Overstreet was in serious contention for the project. If the SSA erroneously graded Boldt as "Exceptional," then the SSA would have decided between Overstreet and another "Exceptional" offeror. The SSA would base the ultimate decision on another, yet more difficult performance/price tradeoff analysis than the original award to Boldt because the next "Exceptional" offeror's bid was approximately $500,000 more than Overstreet's. Admin. R. at 750. If there is indeed only a minimal difference between Boldt's "Exceptional" rating and Overstreet's "Very Good" rating, as Overstreet contends, it would be problematic for the SSA to justify selecting the next lowest priced "Exceptional" offeror's bid, which was 25 percent higher than Overstreet's offer. Accordingly, this court cannot say as a matter of fact and law that Overstreet had no "substantial chance" to receive the contract award absent the USAF's al-

leged error in awarding Boldt the Randolph AFB contract.

### E. The Heart of the Matter: Was the Solicitation Ambiguous?

Turning to the merits of this case, it is painfully obvious that the dispute between the parties centers on a significant difference of opinion surrounding the meaning of the standards and key phrases of the solicitation. The very rationality of the SSA's evaluation of the bids is predicated upon the definition of key terms, the interpretation of the evaluation standards contained in the solicitation, and the construction of the comparison methodology used to grade or rank the successive bids. This is the heart of this protest.

■ This court must commence its analysis by construing the plain language of the solicitation. *Jowett, Inc. v. United States*, 234 F.3d 1365, 1368 (Fed.Cir.2000). The interpretation of a solicitation is not a matter of *post hoc* subjective opinion but is an objective question of law. *See Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed. Cir.1996). Where the solicitation's language is clear and unambiguous, this court will give words their plain and ordinary meaning. *Id.* This court must consider the solicitation as a whole and interpret it to "effectuate its spirit and purpose, giving reasonable meaning to all parts." *Hunt Const. Group, Inc. v. United States*, 281 F.3d 1369, 1372 (Fed.Cir.2002). This court, furthermore, will prefer an interpretation that gives a reasonable meaning to all parts of the solicitation to one that leaves portions of the solicitation meaningless. *See Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir.1985).

■ Whether a solicitation's provisions are ambiguous is also a question of law. *Grumman*, 88 F.3d at 997. If this court detects an ambiguity in the solicitation, its next step is to determine whether that ambiguity is patent or latent. A patent ambiguity is one that is "so glaring as to raise a duty to inquire," and may manifest itself as an "obvious, gross, [or] glaring" error, discrepancy, or gap in the solicitation's language. *Jowett,*

---

9. For as the great dispenser of wisdom, Confucius, opined: "A man who has committed a mistake and does not correct it, is committing another mistake." Confucius (551 B.C.–479 B.C.), as collected by *Coles Quotables*, found at www.quotationspage.com.

234 F.3d at 1368, n. 2.; *see also Grumman,* 88 F.3d at 997; *Veit & Co., Inc. v. United States,* 56 Fed.Cl. 30, 35 (2003). An offeror, therefore, must identify and seek clarification of any patent ambiguities before submitting its bid. *See Grumman,* 88 F.3d at 997; *Newsom v. United States,* 230 Ct.Cl. 301, 676 F.2d 647, 649 (1982).

 While a patent ambiguity imposes a duty of inquiry on an offeror, a latent ambiguity places the risk on the drafter of the contract or solicitation. *Jowett,* 234 F.3d at 1368, n. 2; *Hills Materials Co. v. Rice,* 982 F.2d 514, 516 (Fed.Cir.1992). The court will construe the ambiguous provision against the drafter, as well as adopt the offeror's interpretation, only if the offeror's interpretation is reasonable. *See Jowett,* 234 F.3d at 1368, n. 2.; *Hills Materials Co. v. Rice,* 982 F.2d 514, 516 (Fed.Cir.1992); *Community Heating & Plumbing Co., Inc. v. Kelso,* 987 F.2d 1575, 1579 n. 6 (Fed.Cir.1993). The court notes that not every disagreement as to the meaning of a solicitation or its provisions constitutes either a latent or patent ambiguity. *Community Heating,* 987 F.2d at 1578. A solicitation is ambiguous *only* if it is susceptible of two different and reasonable interpretations, each of which is found to be consistent with the contract language. *Jowett,* 234 F.3d at 1368 n. 2.

 It is painfully obvious that the dispute between the parties centers on a significant difference of opinion surrounding the meaning and application of the standards and key phrases of the solicitation. The central issue of this case lies with the parties' competing interpretations of the following provision of Paragraph II(g) of Section M of the solicitation:

> [P]erformance by the offeror as a prime contractor will be considered more relevant than performance as a subcontractor. Also, performance by the offeror under it's [sic] current business structure will be considered more relevant than performance by predecessor companies, key personnel, or key subcontractors.

Admin. R. at 64, Section M, para. II(g).

Overstreet, both in its brief and at oral argument, contends the SSA acted arbitrarily and capriciously in failing to discount Boldt's bid for using subcontractors. Overstreet interprets these sentences of Paragraph II(g) as a comparison between separate entities rather than as a part of the SSA's overall evaluation of the same entity. In Overstreet's opinion, this provision acts as a list of preferences which the SSA must use to compare offerors.

> [T]here were three levels of consideration. The first preference that you, the offeror, performed the work as a prime contractor. Second, if you couldn't meet the [sic] that, then show us you did it as a sub. And if you can't meet that, then show us that you have key electrical subcontractors who are going to be working on this work. So we start out if we're comparing ... the rating of Boldt to the rating of Overstreet, that Boldt submits projects in the lowest of these three levels and Overstreet submits projects in the highest.

Tr. of Oral Arg. at 20: 3–13.

The government rebuts Overstreet's argument by claiming Overstreet, and not the SSA, misinterpreted this section of Paragraph II(g). In the government's view, this clause required the SSA to look at each offeror as a whole, assign it a grade, and *then* compare the offerors in its best value determination.

> [B]oldt is a general contractor and the way Boldt is proposing to do this project is as a general contractor using certain subcontractors to perform the key electrical work. I think one of the problems here with Plaintiff's approach is that they're breaking it up. Looking at Boldt separately, looking at Boldt's subcontractors separately. But what the government liked about the Boldt proposal and what Boldt showed in its references was the total package and I think it needs to be evaluated as a total package, and that's how the selection authority did evaluate it—as a total package. You don't see separate evaluations of Boldt and then separate evaluation of Boldt's subcontractor's as if they were bidders because they aren't the bidders here. So you have to look at Boldt with its subcontractors as a unit.

[sic] and that's how the proposal was made.

*Id.* at 63: 24–25; 64: 1–18.

After considering the language of the paragraph, the parties' arguments, and the applicable case law, this court finds no ambiguity in Paragraph II(g) of the solicitation. Section M, entitled "EVALUATION CRITERIA," outlines the criteria and standards binding on the evaluations of all offerors. Admin. R. at 62. The most critical aspects of the entire solicitation, the USAF's preferences and evaluation criteria, are contained in Paragraph I of Section M. Therein, the USAF clearly considered past performance as "significantly more important than price." *Id.* at 63. Next, Paragraph I outlines the USAF's evaluation criteria, and indicates that the SSA will evaluate an offeror's past performance, assign it a grade, and *then* make a best value determination in light of the performance grade and its proposed price for the project. *Id.*

Paragraphs II(a) through (f) of Section M outline the SSA's approach to evaluating an offeror's bid for the Randolph AFB project. These provisions describe the grades the SSA would assign an offeror after evaluating its bid, the reference material an offeror could use as proof of its past performance and experience, and the performance "subfactors" the SSA planned to use in assessing an offeror's performance and assigning a grade. *Id.* After the solicitation outlines the evaluation standards, it then identifies "currency" and "relevancy" trends that the SSA would use as a filter in the evaluation.

The solicitation in Paragraph II(g) then clearly states the SSA will place the greatest weight on projects that offerors performed as prime contractors. "Performance as a prime contractor will be considered more relevant than performance as a subcontractor." *Id.* at 64. Neither party disputes the plain meaning of this sentence. The disagreement between Overstreet and the government, however, lies in their respective interpretations of the last sentence of Paragraph II(g): "*Also, performance by the offeror under it's* [sic] *current business structure will be considered more relevant than performance by predecessor companies, key personnel, or key subcontractor.*" *Id.* (Emphasis added).

Overstreet argues that this provision requires the SSA to downgrade Boldt's award because it chooses to use subcontractors. This interpretation belies the plain meaning of Paragraph II(g). Using Overstreet's logic, the SSA would first look at Overstreet and Boldt's bids, then determine if either offeror planned to use subcontractors, next, give additional weight to Overstreet because, as a prime contractor, it planned to do the work by itself, and finally, assign a performance grade based on the past performance of each offeror. Thus, according to the Overstreet paradigm, Boldt's evaluation ought to be of lesser merit because its relevant past job performances, as well as the bid job, were and are to be performed by subcontractors and not by Boldt in its capacity as prime contractor. Nevertheless, Overstreet's paradigm fails because it does not take into account the plain meaning of the last two sentences of Paragraph II(g) *within* the context of the solicitation's performance analysis.

The word "also" is the key to understanding the last sentence of Paragraph II(g). "Also" has two definitions: (1) "in the same manner as something else;" the synonym is "likewise;" and (2) "in addition," or "as well;" the synonym being "besides" or "too." [10] Overstreet's interpretation favors the first definition of "also." To be sure, this would render redundant, at least for evaluation purposes, that last part of the final sentence of Paragraph II(g) that refers to the subcontractor. In this interpretation, the effect would be exactly the same, causing both sentences to give less weight to relevant work

---

10. *See* www.http.//Merriam-Webster Unabridged Dictionary:
Main Entry: also
Function: *adverb*
Etymology: Middle English *also, alswa,* from Old English.
1. in the same manner as something else. **LIKEWISE** (example: "another fallen prince,

who is *also* unknown to the students of literature" R.D. Altick; "They *also* serve who only stand and wait." John Milton).
2. in addition: as well: **BESIDES, TOO** (example: "had immense dignity and reserve, but he *also* was self-sufficient." Harry Hansen).

performed by subcontractors (whether done by the offeror itself in the first sentence or by a key subcontractor in the next) than the same work performed by a prime contractors.[11] Presumably, since the evaluation standards section of any solicitation is keyed to scoring, if Overstreet's interpretation is correct, a much clearer way to draft the provision would have been to simply state in one sentence that relevant work done by an offeror-prime contractor would be evaluated higher than work done by a subcontractor.

More importantly, however, this interpretive paradigm is fatally flawed because it ignores a key phrase in the second sentence which gives a clue to the application of the evaluation criteria: *"under it[s] current business structure."* The full second sentence thus reads: "Also, performance by the offeror *under it's* [sic] *current business structure* will be considered more relevant than performance by predecessor companies, key personnel, or key subcontractor." The better meaning, to avoid redundancy as well, is that the SSA will give greater credence to the relevant past job performances of a prime contractor, which routinely conducts business through hiring and supervision of subcontractors, than to the relevant past job performances submitted for review by key employees or key subcontractors. The "also" modifying this sentence is conjunctive. That is, it makes clear this second sentence adds additional or different evaluation criteria than the first sentence. Clearly, an interpretation that gives a reasonable meaning to *all* parts of the solicitation is preferable to one that leaves portions of the solicitation meaningless. *See Fortec Constructors,* 760 F.2d at 1291.

This second interpretive paradigm mandates that the SSA first evaluate each offeror independently, then assign a grade, and finally engage in an across-the-board comparison of the offerors to determine which offeror's bid represented the best value to the government. It does not compel a comparison between Overstreet's relevant work and relevant work Boldt performed as a prime contractor. Likewise, it does not require that Overstreet merits a higher grade for relevant work it performed as a prime contractor vis-a-vis relevant past performances of subcontractors submitted by Boldt on projects where Boldt employed these subcontractors. What the evaluation criteria of the solicitation does do is to call for the SSA to grade each offeror separately (in this case Overstreet, Boldt, and the four other bidders), determine a rating, and select a winner on the basis of such rating. The SSA adhered to this exact methodology. The SSA followed the solicitation's framework and assigned a performance grade only after analyzing each offeror on its own merits. As a result, this court finds the government's interpretation of Paragraph II(g) complies with the plain meaning of the solicitation.

Indeed, the government's interpretation of Paragraph II(g) makes much more sense in light of the USAF's emphasis on the offerors' quality control and management ability as a means of decreasing the possibility of blackouts and power failures. The evaluation criteria listed quality control and management ability as subfactors in the SSA's analysis. *See* Admin. R. at 63, Section M, para. II(e). Recognizing the national security implications noted above, concern over these subfactors were heightened and certainly rational.[12]

---

**11.** In other words, it interprets the meaning of the last two sentences as follows: "Performance as a prime contractor is more relevant than its performance as a subcontractor. *Likewise,* performance by the offeror ... is more relevant than performance by key subcontractors." In both instances, work done by the prime contractor warrants greater consideration than work done by any subcontractor.

**12.** In the SSDD, the SSA writes:

The Switching Station is a critical project because of the multiple missions performed at Randolph AFB are dependent on an uninter-

rupted source of electrical power ... Any type of performance failure could result in a complete loss of power to Randolph Air Force Base including the Air Force Personnel Center; Air Education Training Command headquarters; Air Force Recruiting Service headquarters; and Nineteenth Air Force Headquarters. A power failure or other performance problems would interrupt the base pilot training mission, and could also seriously impact ongoing personnel management problems throughout the Air Force, interrupt recruiting efforts, and otherwise create significant problems that would have serious adverse impact on both human and material resources.

Consequently, the plain language of Paragraph II(g) must be placed it its proper context so as to give it and all parts of the solicitation a reasonable meaning that avoids a wooden literalism that contravenes "the spirit and purpose" of the solicitation. *See Hunt*, 281 F.3d at 1372. *See also United States v. Fisher*, 6 U.S. (2 Cranch) 358, 385–89, 2 L.Ed. 304 (1805) (analyzing statutory language in the context of the title of the statute).[13] *See generally* R. Dickerson, *The Interpretation and Application of Statutes* 1158 (1975) ("One is liberated from literalism by learning to read in context."). Adopting Overstreet's interpretive paradigm would result in a wooden literalism that renders brittle the SSA's flexibility under the evaluation in selecting bids that protect the security and viability of Randolph AFB.

In light of the above, this court finds no ambiguity in Paragraph II(g) and interprets the standards contained therein as a requirement that the SSA evaluate each offeror independently and then compare the offerors to each other. Consequently, this court rejects Overstreet's contention of latent ambiguities in Paragraph II(g) simply because Overstreet's interpretation is not reasonable. Overstreet's characterization of Paragraph II(g) ignores the additional requirement of evaluating an offeror under its current business structure. The court's interpretation, on the other hand, gives effect to the solicitation's stated evaluation framework and purposes, and avoids the destructive redundancy of Overstreet's interpretation.

Admin. R. at 751–52.

**13.** This case is often quoted for Chief Justice John Marshall's dictum that attention to context is often crucial in statutory interpretation: "[w]here the mind labours to discover design . . . it seizes everything from which aid can be derived . . . ." *Fisher*, 6 U.S. (2 Cranch) at 385–89.

**14.** It is interesting to note that at oral argument Overstreet specifically eschewed any argument based on latent ambiguity. This position, interestingly enough, if it prevailed would have required construing the provision in question against the drafter, the USAF. *See Jowett*, 234 F.3d at 1368, n. 2; *Hills Materials Co.*, 982 F.2d at 516. Tr. of Oral Arg. at 12: 7–25, 13: 1–7. Instead, Overstreet characterized its argument not as an attack on the solicitation's standards,

Similarly, the court rejects the government's invocation of the patent ambiguity rule. What we have here is not a disagreement over the fairness of the terms of a solicitation (*see Halter Marine*, 56 Fed.Cl. at 169 (time to object to alleged missing elements in the questionnaire was prior to bid)) or a failure to protest recognized ambiguities in terms (*see DSD Labs., Inc. v. United States*, 46 Fed.Cl. 467, 479 (2000) (noting that the bidder had a duty to inquire regarding an patently ambiguous term in the solicitation prior to submission of final bids)), but a disagreement on how the standards of the solicitation were interpreted and applied, that is, a disagreement over the evaluation process itself.[14] *See Novell, Inc. v. United States*, 46 Fed.Cl. 601, 615 (2000). In other words, the court declines to accept the government's position that *de facto* any two competing interpretations constitute either a latent or a patent ambiguity, the latter requiring an offeror to disclose prior to the award of a contract or face waiver of the protest.[15]

But clearly not every disagreement as to the meaning of the provisions of a solicitation rises to a level of latent or patent ambiguity. *See Community Heating*, 987 F.2d at 1578. One party, such as Overstreet here, may simply be wrong. Perhaps just as important, a genuine dispute as to meaning may not arise until *after* the procurement agency awards the contract. To be sure, to adopt the government's sweeping position would in many cases work a constructive repeal of the 1996 Amendment to the Tucker Act, 28

but on the SSA's interpretation and implementation of the evaluating process. *Id.*

**15.** The government notes that Overstreet never objected to any terms of the solicitation and that the solicitation, as part of a negotiated procurement, explicitly required that an offeror:

clearly identify each such exception and include a complete explanation of why the exception was taken and what benefit accrues to the Government. All exceptions . . . and supporting rationale shall be included in an Addendum to the proposal clearly labeled 'Exceptions' . . . The Government will assume an offeror takes no exceptions to any solicitation requirement if the offeror does not submit an Addendum identifying exceptions.

Def.'s Mot. for J. on the Admin. R. at 9,(citing Admin. R. at 59, Section L, para. I(c)).

U.S.C. § 1491(b)(1), which was enacted in part to allow spurned bidders to protest a proposed award after it was made.[16] Consequently, while the court agrees with the government's interpretation of Paragraph II(g), Section M, it wholly rejects the government's argument that the patent ambiguity rule precludes Overstreet's challenge to the SSA's decision.

### F. *Was the SSA's Decision Arbitrary, Capricious, or Contrary to Law?*

Given the court's clarification of the meaning of the standards of evaluation contained in the solicitation, it is fairly easy to resolve whether the contract awarded to Boldt failed to adhere to the standards contained in section 706 of the APA as incorporated in section 1491(b)(4) of the Tucker Act, 28 U.S.C. § 1491(b)(4) (2000). Tr. of Oral Arg. at 12: 7–25; 13: 1–7. This central issue breaks down into two separate and distinct questions: (1) whether the SSA possessed a rational basis to award Boldt an "Exceptional" past performance rating, and (2) whether the SSA's Performance Price Trade-off analysis was arbitrary and capricious.

#### 1. *Was Boldt's "Exceptional" Rating Rational?*

■■■ Before turning to the court's findings and analysis, it is well worth risking a little redundancy to briefly restate exactly what the standard of review applicable in this bid protest case demands: that this court *must* defer to the SSA's decision absent a showing that the SSA's evaluation was arbitrary, capricious or contrary to law. *Info. Tech.*, 316 F.3d at 1319. But that is not all. This standard becomes *more* deferential when dealing with a negotiated procurement such as the one in this case. *LaBarge*, 46 F.3d at 1555; *Lockheed Missiles*, 4 F.3d at 958. And when a procurement involves performance standards, which is what this court also faces, a court must grant *even more* deference to the evaluator's decision. *See E.W. Bliss*, 77 F.3d at 449; *Lockheed Missiles*, 4 F.3d at 958. In other words, Over-

street must overcome a triple whammy of deference by demonstrating by a preponderance of the evidence that the SSA lacked *any* rational basis to grade Boldt as "Exceptional."

It is not surprising then, in light of applying this onerous standard to all the relevant facts contained in the administrative record, that this court finds Boldt's "Exceptional" rating was indeed rational. This court once again refers to the Source Selection Decision Document, the SSDD, as the definitive indicator of the SSA's analysis. Admin. R. at 745–752. In sum, here is how the SSA arrived at Boldt's "Exceptional" rating, in accordance with the criteria contained in Paragraph II of Section M of the solicitation.

Initially, the SSA must evaluate the offerors' past performance contracts within the parameters of Paragraph II(g) of Section M—currency, relevancy, and performance. First, as to "currency" the SSA must place the greatest weight on an offerors' contracts completed within three years of August 1, 2003. *Id.* at 64. The SSA, conversely, could give little or no weight to any submitted past performance falling outside of that time period. *Id.* Accordingly, looking specifically at the currency evaluation of Boldt, the SSA correctly applied this criterion by noting that one of Boldt's contracts was completed more than three years ago. *Id.* at 747, para. 3. And while not eliminating it altogether, which the "currency" criterion did not require, the SSA accurately placed less emphasis on this contract and gave greater weight to Boldt's other two relevant and more current contracts. *Id.*

Second, the SSA needed to evaluate both past submitted contracts in terms of "relevancy" and "performance," while placing greater weight to "highly relevant" contracts, specifically the "successful performance in the construction of medium voltage switchgear and distribution systems of other electrical projects." *Id.* at 745. Here is where the parties' conflicting interpretations of the critical role of the subcontractors comes into play. As the court concluded in

---

**16.** "[T]he United States Court of Federal Claims ... shall have jurisdiction to entertain such an action without regard to whether suit is institut- ed before or after the contract is awarded." 28 U.S.C. § 1491(b)(1).

the prior section, the SSA was required to evaluate the performance records of any subcontractors submitted as a part of an offeror's bid and give greater weight to an offeror's performance as a prime contractor than to its performance as a subcontractor. *Id.* Yet to arrive at a rating, the SSA also could consider an offeror's past performance projects under its current business structure more relevant than performance by an offerors' predecessor companies, key personnel, or key subcontractors. *Id.*

The court finds that the SSA followed the correct procedure in applying the relevancy criterion to Boldt. First, while the solicitation required the submission of three, but no more than six, relevant past performance contracts, *Id.* at 59, offerors that planned to subcontract key electric work also had to submit past performance information for the proposed electrical subcontractors, *Id.* at 60. The record is clear that Boldt included performance information for six contracts, *Id.* at 236–39, and also identified five contracts for each of its proposed electrical subcontractors, *Id.* at 240–43. While the SSA evaluated only three of the six contracts Boldt submitted as past performance contracts, *Id.* at 747, the solicitation did not require the SSA to evaluate all submitted past performance contracts. Instead, the solicitation left it to the SSA's discretion just how many past performances were necessary for the past performance evaluation. *Id.* at 63, Section M, para II(b). To this the court must defer. *See CTA, Inc. v. United States,* 44 Fed.Cl. 684, 692 (1999).

In appraising the relevancy of past performance contracts, the solicitation required a comparison of the similarity of construction methods and the scope (size and complexity) to the project solicited under this contract. *Id.* at 64, Section M, para. II(g). But such appraisals are to a great degree subjective. Indeed, the offerors were explicitly placed on notice of this. See *Id.* at 63 ("While the Government and the Contracting Officer will strive for maximum objectivity, the evaluation process, by its nature, is subjective and therefore, professional judgment is implicit throughout the entire evaluation process.").

Consequently, the court cannot conclude that Boldt's submitted three past perform-

ance contracts considered by the SSA were irrelevant because on all three projects Boldt was the prime contractor with oversight responsibilities over electrical subcontractors. *Id.* at 747–48. It was reasonable, the court concludes, for the SSA to consider such experience relevant because that is exactly the role Boldt proposed to play in this contract, a prime contractor supervising electrical work performed by electrical subcontractors. *Id.* at 751. For this court to conclude otherwise, would be to substitute the court's judgment for the discretionary determinations of the agency evaluator and thus contravene the Federal Circuit's deferential standard of review in performance standards cases. *See Info. Tech.,* 316 F.3d at 1323 n. 2. *See also E.W. Bliss,* 77 F.3d at 449 (court regulation of the minutiae of procurement process impermissibly second guesses agency contracting officials).

The SSA also was required to rate each offeror's past performance contracts in light of the five performance subfactors identified in Paragraph II(e), Section M of the solicitation. Admin. R. at 63. These subfactors included (1) quality control, (2) timely performance, (3) management effectiveness, (4) compliance with labor standards, and (5) compliance with safety standards. *Id.* Of these subfactors, quality control was clearly considered the most important. *Id.*

The Air Force was well-within its rights to insist on taking into account these subfactors in extrapolating from an offeror's past performance contracts its ability to successfully perform in the bid contract at hand. Indeed, it is certainly reasonable for the Air Force to consider quality control as the most important of these subfactors. Randolph AFB conducts a number of training missions vitally important to America's national security. It is uncontroverted in the record that any interruption in the electricity could plausibly result in the temporary cessation of flights, the possible closure of the airfield, and the shutting down of training schools and operations. *See* Admin. R. at 751–52. In these times of heightened security at home, as well as lethal hostilities overseas, it is appropriate for the court to weigh in its calculus that the nation can ill afford any temporary, let alone

permanent, weakness in national security. *See Yakus v. United States,* 321 U.S. 414, 440, 64 S.Ct. 660, 88 L.Ed. 834 (1944) (denial of an interim injunction seeking to enjoin a wartime measure not a violation of due process because its grant would be contrary to the public interest). Moreover, in placing the greatest emphasis on quality control, the Air Force put all offerors on notice that it considered of paramount importance an offeror's ability to successfully complete a project without delay and without any significant material defects. *See* Admin. R. at 751–52.

In that regard, it is important to note the SSA's acknowledgment that Boldt's references rated its past performances "exceptional" for quality control. *Id.* at 747. Likewise, the SSA also recognized that the references for Boldt's subcontractors not only rated them "exceptional" overall, but also as "exceptional" for quality control. *Id.* at 747–48, 51–52. Furthermore, the record supports the SSA's conclusion that Boldt possessed accomplished management expertise demonstrated by Boldt's successful supervision of its key subcontractors on past projects similar to the current bid contract. *Id.* at 751. Similarly, because it goes to the display of superior management skills, it was proper for the SSA to factor into the evaluation Boldt's successfully managed projects involving subcontractors responsible for varying types of tasks. *Id.* at 751–52.

So while the SSA found potential concern about Boldt's reliance on subcontractors, contrary to Overstreet's contention, there existed more than enough evidence in the record to justify the SSA's conclusion that Boldt's management record of success supervising other relevant projects mitigated its own lack of experience in constructing medium voltage switching stations. *Id.* at 752. Additionally, aside from the all-important ability to successfully complete the project at hand, Boldt's five "letters of appreciation" from the Corps of Engineers and commercial contract customers, including one that pertained to one of Boldt's proposed key subcontractors, buttress the SSA's "Exceptional" rating for Boldt. *Id.* at 747.

Accordingly, based on all the surrounding circumstances, the court finds that the SSA could rationally conclude that Boldt, acting in its supervisory capacity as prime contractor, could successfully complete the repairs or possible replacements of the medium voltage switching station at Randolph AFB without causing an interruption in Randolph's operations and, therefore, was entitled to an "Exceptional" rating. Overstreet fails to show even by a preponderance of the evidence that the SSA's evaluation was arbitrary or capricious and thus that Boldt's rating was unreasonable. Based on review of the administrative record and the evaluation criteria specified by the solicitation, this court concludes that the SSA had a rational basis to award Boldt a performance confidence rating of "Exceptional."

### 2. *Was the Performance/Price Trade-off Analysis Rational?*

■ Finally, Overstreet fails to show that the SSA's trade-off analysis was arbitrary and capricious. In this case, the solicitation unambiguously stated the SSA would award the Randolph AFB contract using a competitive best value, single award acquisition utilizing performance price trade-off. *Id.* at 62. The solicitation's clear and direct terms placed all offerors, including Overstreet, on notice that the best value determination may result in the contract awarded to a higher-rated, higher-priced offeror when the SSA determined that the past/present performance of the higher-priced offeror outweighs the difference. *Id.* Indeed, the solicitation made clear that past performance would be significantly more important than price. *Id.* at 63. The SSA, in accordance with the solicitation, rationally determined Boldt merited an "Exceptional" ranking while Overstreet merited a "Very Good" ranking. Contrary to Overstreet's assertions, the SSA also acknowledged Boldt submitted a bid approximately $200,000 greater than Overstreet's bid. The SSA, however, determined the ten percent price premium was justified because it provided the Air Force the highest level of confidence that the project would be completed in a problem-free manner. *Id.* at 752.

Overstreet's allegation that the SSA did not adequately consider price in its tradeoff analysis is not in accord with the administra-

tive record. The SSA followed the solicitation's evaluation criteria and considered Overstreet a leading contender for the Randolph AFB contract despite its "Very Good" grade because Overstreet provided the lowest bid. The SSA first concluded that four other offerors proposed bids higher priced than Boldt and received either equal or lower performance confidence rankings to Boldt. *Id.* at 751. The SSA, therefore, reasonably concluded that awarding the contract to any of these offerors over Boldt provided no benefit to the government. *Id.* This determination left Boldt and Overstreet as the only remaining offerors. The SSA, in the trade-off analysis, turned to both Boldt's and Overstreet's performance records in an effort to distinguish the two offerors. The SSA reasonably determined Boldt's higher past performance ranking was worth the price difference because it provided the government with the greatest assurance that the Switching Station project will be completed without a problem. *Id.* at 752.

The USAF designed this project to replace the main electrical distribution switchgear and main electrical feeders serving the entire Randolph AFB, which includes the Air Force Personnel Center, the headquarters of the Air Education Training Command, the Air Force Recruiting Service, and the Nineteenth Air Force. The SSA, in the SSDD, emphasized that any type of performance failure on the project could result in a complete loss of electrical power to the base. The SSA stated that a power failure or other performance problems would interrupt the base pilot training mission, and could also seriously impact ongoing personnel management programs, recruiting efforts, and other Air Force functions. *Id.* This court finds the SSA's decision was reasonable because of the USAF's stated concerns about power failures occurring at Randolph AFB.

Based on Boldt's performance references, the SSA could rationally conclude that Boldt would complete the project on-time and error-free. The administrative record indicates Boldt is an experienced prime contractor with a record for successfully completing complex projects using a variety of subcontractors. While Boldt lacked experience

building electrical switching stations, the SSA acknowledged this fact and determined Boldt's experience as a prime contractor, as well as its exceptional performance record, mitigated any of Boldt's inadequacies relative to this contract. This court, therefore, finds it was reasonable for the SSA to conclude that it is in their best interest to award an offeror meriting an "Exceptional" ranking the project over an offeror with a "Very Good" ranking. "An agency is accorded broad discretion when conducting its past performance evaluations," *Computer Sciences Corp. v. United States*, 51 Fed.Cl. 297, 319 (2002), and thus "can give more weight to one contract over another if it is more relevant to an offeror's future performance on the solicited contract." *Forestry Surveys & Data v. United States*, 44 Fed.Cl. 493, 499 (1999). While price differential may be taken into account to determine a best value award, "it is not solely dispositive; we must consider all the surrounding circumstances." *See Alfa Laval*, 175 F.3d at 1368.

As a result, this court finds Overstreet failed to satisfy its burden of proof that the SSA acted arbitrarily and capriciously when it awarded Boldt the Randolph AFB contract. In light of the facts in the Administrative record, this court finds the SSA possessed a rational basis according to the solicitation's performance price trade-off terms to award Boldt the Randolph AFB contract.

### III. Conclusion

For the foregoing reasons, the court **GRANTS** defendant's motion for summary judgment on the administrative record and correspondingly **DENIES** plaintiff's cross-motion. Because the defendant's motion is **GRANTED**, plaintiff's petition for an injunction is **DENIED** as moot. The Clerk of the Court is directed to enter judgment in favor of the United States.

**IT IS SO ORDERED.**