**KROPP HOLDINGS, INC.,**
**d/b/a Avcard, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 04–1655C.

United States Court of Federal Claims.

Jan. 27, 2005.

John P. Janecek, Wilmer Cutler Pickering Hale and Dorr, L.L.P., Washington, D.C., for plaintiff.

Kent Gerald Huntington, United States Department of Justice, Washington, D.C., for defendant.

Craig Alan Holman, Holland & Knight, L.L.P., Washington, D.C., for defendant-intervenor.

**PUBLIC VERSION**[1]

## OPINION DIRECTING ENTRY OF FINAL JUDGMENT

BRADEN, Judge.

On September 14, 2001, Congress enacted a Joint Resolution to authorize the use of the United States Armed Forces against those responsible for the recent attacks launched against the United States. *See* Pub.L. No. 107–40, 115 Stat. 224 (2001). One of the critical findings made by Congress was that there is a "threat to the *national security* and foreign policy of the United States … and that such acts continue to pose an unusual and extraordinary threat to the *national security* and foreign policy[.]" *Id.* (emphasis added). As two former Department of Justice officials recently observed:

> [C]ongressional concurrence is welcome in making clear that the branches agree on the seriousness of the terrorist threat currently facing the Nation and on the need for a military response.

Robert J. Delahunty and John C. Yoo, "The President's Constitutional Authority To Conduct Military Operations Against Terrorist Organizations And The Nations That Harbor Or Support Them," 25 HARV. J.L. & PUB. POLICY 487, 516 (Spring 2002).

A military response was ordered by President George W. Bush in Afghanistan and Iraq, which is ongoing and likely to continue for many months ahead. Therefore, during this critical and sensitive period, if the United States Court of Federal Claims again is petitioned to enjoin the head of a military agency from authorizing an override of the automatic stay provision, pursuant to 31 U.S.C. § 3553(d)(3)(C), and where the procurement involved is one that is facially "mission critical" or "mission essential," the "interests of national defense and national security" must be paramount in deciding how jurisdiction should be exercised under 28 U.S.C. § 1491(b)(1).

The override action in this case was authorized by the Defense Energy Support Center of the Defense Logistics Agency and concerns the "full range of credit card support for aviation and bunker fuel worldwide." Therefore, the court has determined that "interests of national defense and security"

---

1. This Opinion Directing Entry of Final Judgment was released in a non-public version to the parties on December 16, 2004. The public version was embargoed until January 13, 2005 to allow a pending and related bid protest to be resolved by the Government Accountability Office, which rendered a decision on December 30, 2004 denying plaintiffs' protest. *See AVCARD*, Comp. Gen. Dec. B–293775.2 (Dec. 30, 2004). Since the record and pleadings filed in this case are under seal, pursuant to a November 12, 2004 Protective Order, the court has redacted portions of the public version subject to that Order or that otherwise contain information that the court considers to be confidential. Nevertheless, Plaintiff has continued to object to the inclusion of certain information in the public version of this opinion. The Government, however, does not object to this information being made part of the public record in this case. Therefore, the court hereby overrules plaintiff's objections. The court has redacted only information that contains confidential, business and/or proprietary information, so that the interests of the private parties are balanced with the public interest requiring continued transparency in the judicial process.

render it not "necessary" for the court to "decide all relevant issues of law[.]" 5 U.S.C. § 706; *see also* 28 U.S.C. § 1491(b)(1); 28 U.S.C. § 1491(b)(3). Accordingly, for the reasons discussed herein, Plaintiff's November 19, 2004 Cross–Motion for Summary Judgment on the Administrative Record is denied. Defendant–Intervenor's Motion For Summary Judgment is denied as moot. All other motions filed before the court have been withdrawn or are now moot.

## RELEVANT FACTS [2]

### A. The Parties.

#### 1. The Plaintiff—Kropp Holdings, Inc. d/b/a AVCARD.

Plaintiff, Kropp Holdings, Inc. d/b/a AV-CARD ("AVCARD") is a privately held Maryland corporation with its principal place of business in Hunt Valley, Maryland. *See* Compl. ¶ 1. AVCARD's annual revenues are approximately $[ ] million. *See* TR at 35; Dec. 3, 2004 Pl. Supplemental Submission at 4. Since 1977, AVCARD has provided the Defense Energy Support Center ("DESC") with services to support the Aviation Into–Plane Reimbursement ("AIR") Card Program. *See* AR at 211. That contract currently represents [ ]% of AVCARD's gross revenues or $[ ] million, which represents [ ]% of AVCARD's net profits. *See* TR at 35. In 2004, Kropp Holdings, Inc. also was awarded a $11,880,000 contract from the Defense Energy Support Center to provide liquid propellants and fuel in Iraq. *http://www. publicintegrity. org/wow* (12/1/04).

Kropp Holdings' stock is owned ( [ ]%) by Ms. Linda Kropp, President and Chief Executive Officer. *Id.* at 1. Mr. Frank Schmieder owns the remaining [ ]%. *Id.* According to Ms. Kropp's resume, AVCARD was formed in 1988 through the purchase of the assets of an aviation credit card division of the PHH Group, Inc. *Id.* at 2. Since that time, AV-CARD:

> has grown from a small aviation credit card issuer and processor to become a multinational concern providing aviation logistics and planning, contract fuel and aviation purchasing program management for corporate, military, and commercial airline clients worldwide. Among these clients are most of the world's corporate/charter flight departments, practically all branches of the U.S. Government, commercial airlines and foreign government aircraft such as the Italian, Canadian, Norwegian, Australian, German, and Belgium Air Defense forces.

*Id.*

According to Mr. Schmieder's vitae, he is the founding member of Applied Media Resources, Inc., a company that specializes in "development and integration [of] graphical software into complex business solutions." *Id.* at 4. From 1989–1994, Mr. Schmieder was Chief Executive Officer of Greyhound; from 1976 to 1987, he served in several key positions in the PHH Group. *See* Dec. 3, 2004 Pl. Supplemental Submission at 4.

#### 2. The Defendant–In–Fact—The Defense Energy Support Center.

The Defense Logistics Agency ("DLA") is responsible for providing the Department of

---

**2.** The relevant facts recited herein primarily were derived from the: Administrative Record, filed on November 12, 2004 ("AR"); November 5, 2004 Complaint for Injunctive and Declaratory Relief ("Compl."); November 5, 2004 Memorandum of Law In Support of Plaintiff's Motion for a Preliminary Injunction ("Pl.Br."); November 5, 2004 Plaintiff's Motion for a Preliminary Injunction ("Pl. Mot. for Prel. Inj."); November 8, 2004 Defendant–Intervenor's Motion to Intervene ("MSC Mot. Int."); November 16, 2004 Defendant–Intervenor's Statement of Material Facts Not In Dispute ("MSC Stat. of Facts") and Exhibits thereto ("MSC Stat. of Facts Exh."); November 16, 2004 Defendant's Opposition to Plaintiff's Motion for a Preliminary Injunction;

November 16, 2004 Defendant–Intervenor's Motion for Summary Judgment On The Administrative Record ("MSC Mot. S.J."); November 19, 2004 Plaintiff's Counter–Statement of Facts in Response to Defendant–Intervenor's Statement of Material Facts ("Pl. Stat. of Facts"); November 19, 2004 Plaintiff's Statement of Additional Facts; November 19, 2004 Plaintiff's Cross–Motion for Summary Judgment on the Administrative Record ("Pl.Cross–Mot.S.J."); December 3, 2004 Plaintiff's Supplemental Submission ("Pl. Dec. 3, 2004 Supplemental Submission"); December 9, 2004 Defendant–Intervenor's Opposition to Plaintiff's Cross–Motion for Summary Judgment ("MSC Opp."); and December 1, 2004 Hearing ("TR at __").

Defense ("DoD") with worldwide acquisition and distribution of energy products to the military, as well as federal civilian agencies.[3] *See* Compl. ¶ 2; AR at 226, 238. The Defense Energy Support Center ("DESC") is the entity within DLA that is authorized to award contracts for the purchase of fuel at commercial airports and seaports to Fixed Base Operators ("FBOs") and major fuel suppliers throughout the world. *Id.* at 242. AIR purchases are made by military and federal civilian agencies, authorized foreign military, and other authorized aircraft, awarded when annual requirements at a commercial airport exceed 15,000 gallons. *Id.* AIR credit cards, used to purchase fuel at over 6,000 commercial airports worldwide, also can be used to purchase ancillary products and ground services not included in into-plane contracts.[4] *Id.* at 244.

### 3. The Intervenor—Multi Service Corporation.

Defendant–Intervenor Multi Service Corporation ("MSC") is a privately held financial services company that provides credit card processing and other financial and logistical support services to transportation-related industries. *See* MSC Stat. of Facts Exh. 1 at ¶ 2. At present, MSC's Multi Service Card is "the most widely used corporate aviation card in the world." *Id.* At the end of fiscal 2003, MSC's Ernst and Young's Consolidated Financial Statement reported that MSC had a net income of $[    ]; of which $[    ] are cash holdings. *See* MSC Opp. (Tab A) at 2.

MSC's stock is owned by: Mr. Christopher E. Combest ( [ ]%); Mr. Mark M. O'Connell ([ ]%), who serves as President of MSC; Ms. Molly E. Hundley ( [ ]%), who serves as Treasurer and Vice President of MSC; and Ms. Michelle Urness ( [ ]%), who serves as Senior Vice President of MSC. *See* MSC

Opp. Exh. 2 at ¶¶ 6–9. The Board of Directors consists of: [             ]. *Id.* at ¶¶ 10–12.

### B. The August 11, 2004 Department Of Defense Directive No. 5101.8.

On August 11, 2004, DoD issued Directive No. 5101.8 ("the Directive"), wherein DLA was designated as the Executive Agent for Bulk Petroleum, with authority to re-delegate to DESC. *See* AR at 226. The Directive sets forth the following operational responsibilities:

- Execute supply chain management for bulk petroleum owned by DoD, and be responsible for all bulk petroleum supply management from source of supply to the point of customer acceptance, with an emphasis on improving efficiency, including a requirement for customer relationship management;

- Improve support to the warfighter by ensuring peacetime efficient and wartime effective customer support;

- Acquire, store, and distribute bulk petroleum to all DoD customers wherever and whenever it is needed across the full range of operational situations, with the goal of providing the appropriate fuel support for every weapon system;

- Integrate civil and military petroleum capabilities when possible throughout the world where military operations occur;

- Coordinate with DoD components on matters involving fuel acquisition, distribution, and handling whenever operational constraints may be implied;

- Provide fuel support to the Combatant Commanders to meet their operational requirements;

---

3. Many with national security duties utilize DLA services to acquire and distribute federal agencies energy products such as: the Department of Homeland Security; the Federal Aviation Administration; the Department of Justice; the Department of State; the Department of the Treasury; the Department of Agriculture; the Department of Transportation; and the National Aeronautics and Space Administration. *See* AR at 248.

4. Such ancillary fuel related products include: callout fees; flowage fees; fuel additives; overtime charges; rapid/hot refueling fees; and local taxes. *See* AR at 246. Ancillary ground services include: aircraft housekeeping; landing fees; breathing oxygen; de-icing; defuel fees; ground equipment fees; hydraulic fluids; lube oil; and hanger parking fees. *Id.*

• Provide support to the DoD components on matters involving environmental compliance and remediation worldwide to ensure DoD fuel transfers and storage are within regulatory and environmental compliance.

*Id.* at 227.

## C. The Defense Energy Support Center Programs.

### 1. The AIR Card Program.

The DESC is responsible for the AIR Card Program, a credit card payment system that has been in existence for five years. *See* AR at 37. DESC uses the AIR Card Program to:

(1) provide ... maximum flexibility to ... manage the cost, schedule, performance, risks, and data required to provide commercial, state of the art, affordable, high performance, flexible and easy to use credit card processing and support that satisfies DESC's and its customers' requirements; and (2) maintain clear government visibility into cost, schedule, performance, risk, and data.

*Id.* at 78. AVCARD was the contractor for the AIR Card Program until September 30, 2004, when DESC re-competed the requirement "prior to that time to award follow-on continued coverage for all government aircraft." *Id.* at 244.

At most commercial airports where the AIR Card is currently accepted, AVCARD has had an agreement with the FBO to obtain fuel at a discount over the posted airport price. *Id.* at 247.[5] The vendor then forwards the purchase information to the AIR Card contractor for payment. *Id.* If DESC has an agreement with the local vendor, the contractor sends the purchase information to DESC for direct payment to the vendor. *Id.* If the contractor has an agreement with the local vendor, the contractor pays the vendor and then seeks reimbursement from DESC. *Id.* The discount varies from location to location, usually based on volume. *Id.*

### 2. The Ship's Bunkers' Easy Acquisition Card Program.

The Ship's Bunkers' Easy Acquisition ("SEA") Card Program will replace an existing paper-based fuel ordering system used by U.S. military vessels to purchase marine fuel. *Id.* at 37. The SEA Card Program previously used a magnetic strip program, but reverted to a paper-based ordering system that is labor intensive and has been the source of administrative problems. *Id.; see also* AR at 302 (July 26, 2004 e-mail reporting that "[          ].... Although we are all concerned with ... invoicing problems, they are not the highest priority of everyone operating in the war zone.").

The purpose of both the AIR Card Program and the SEA Card Program is to enable military aircraft and vessels to obtain fuel on demand and at substantial savings over posted commercial port prices. *See* AR 36, 243.

### D. Solicitation No. SP0600–04–R–0026 For Both The AIR And SEA Card Programs.

On January 16, 2004, DESC issued Solicitation No. SP0600–04–R–0026 ("the Solicitation"), on a full and open competition basis. *See* AR at 2–3; *see also* AR at 35 ("The purpose for this [Solicitation] was to obtain full range of credit card support to the customer for aviation and bunker fuel worldwide."). The Solicitation proposed a firm fixed-price contract with a three-year base period with five one-year option periods. *Id.* at 6–7, 87–89.

In addition, Solicitation No. SP0600–04–R–0026 specified a "best-value" determination, allowing DESC to select the offer that best suited its requirements, taking into consideration price, technical, and other factors. *Id.* at 87. In that regard, Solicitation No. SP0600–04–R–0026 listed the following specific evaluation factors: 1.) technical propos-

---

5. AVCARD contends that the average savings to the Government has been $[ ] per gallon over the life of AVCARD's performance of Contract No. SP600–00–D–0002 or a total of $[    ] million in savings. *Id.* at 46; *see also* Pl. Stat. of Facts at ¶ 10; Pl. Stat. of Add'n Facts, Exh. B. DESC claims that the average savings under the current AIR Card Program has been $[ ] per gallon. *See* AR at 247.

al; 2.) price/cost; 3.) past performance; 4.) socioeconomic subcontracting. *Id.* at 86. Solicitation No. SP0600–04–R–0026 also discussed the relative importance of the evaluation factors, *i.e.*, technical proposal is more important than price/cost; price/cost was more important than past performance and socioeconomic subcontracting; separately; and even when past performance and socioeconomic subcontracting are combined. *Id.* Past performance and socioeconomic subcontracting were weighted as equal to each other in importance of the value. *Id.* All nonprice evaluation factors, *i.e.*, technical proposal, past performance, and socioeconomic subcontracting, when combined, were considered more important than price. *See* AR at 86. AVCARD, MSC, and two other companies submitted timely offers in response to Solicitation No. SP0600–04–R–0026. *Id.* at 120.[6]

On September 21, 2004, DESC issued a Source Selection Decision Document ("SSDD"), after conducting an evaluation process, discussions, and several rounds of proposal submissions. *Id.* Whether DESC conducted a complete and accurate evaluation of the offerors currently is the subject of an October 4, 2004 bid protest initiated by AVCARD before the Government Accountability Office ("GAO"). *See In the Matter of AVCARD*, Case No. 293975–2 (Government Accountability Office, filed Oct. 4, 2004).

### 1. The Ratings.

The Source Selection Authorities ("SSAs") rated proposals from the offerors for Solicitation No. SP0600–04–R–0026 as follows:

| Offeror | Technical Rating | Past Perf. Rating | Socio–Economic Rating | Total Price for Solicitation No. SP0600–04–R–0026 (Low to High) | Difference (from the lowest offer) |
|---------|------------------|-------------------|------------------------|------------------------------------------------|-------------------------------------|
| [    ]  | Very Good        | Satisfactory      | Very Good              | $[    ]                                         | Lowest Offer                        |
| [    ]  | Exceptional      | Exceptional       | Very Good              | $[    ]                                         | $[    ]                              |
| [    ]  | Satisfactory     | Very Good         | Satisfactory           | $[    ]                                         | $[    ]                              |
| [    ]  | Satisfactory     | Very Good         | Satisfactory           | $[    ]                                         | $[    ]                              |

*Id.*

### 2. The Evaluation.

In reaching a decision, the SSAs, after consulting with the contracting officer, reviewed: 1.) each offeror's proposal; 2.) the Technical Evaluation Reports of each Technical Team member and the Consensus reports; 3.) the Price/Cost Analysis Team report, comparing the offerors' proposed prices/cost; 4.) the Past Performance Evaluation Team's evaluation; 5.) the Socioeconomic Evaluation Team's evaluation; 6.) the Price Negotiation Memorandum; and 7.) the Contracting Officer's Recommendation for Contract Award to the Source Selection Authority. *Id.*

The SSAs evaluation concluded:

Of the four offerors we reviewed, [    ] and MSC had the highest rated technical proposals (Very Good). [    ] received a Satisfactory past performance rating, while MSC received an exceptional Past Performance rating. In comparison, [                ] received Satisfactory technical and Very Good past performance ratings. [    ] and MSC received a Very Good rating for socioeconomic/subcontracting plan. The two other offerors ( [                ] ) received Satisfactory ratings for their socioeconomic/subcontracting plans. All three offerors' (MSC, [    ] and [    ] ) price proposals exceeded [    ].

AR at 120–21.

\*    \*    \*    \*    \*    \*

6. The other companies that submitted offers included [        ]. *See* AR at 120.

We believe the technical superiority, overall business approach, superior past performance, and socioeconomic subcontracting of MSC's proposal makes it the *best value* to the Government.

This decision is based on the added benefits and comprehensive understanding of not only the credit card services required, but also the unique program needs of the AIR and SEA Card Programs addressed in MSC's proposal. As discussed repeatedly above, MSC presented an offer with outstanding features that will benefit the existing program, as well as many value added features that will provide benefits to the government throughout the life of the contract.

MSC's flexible SEA Card ordering mechanism, [            ], demonstrates a thorough understanding of the bunker industry as it exists today. No other proposal demonstrated as extensive an understanding of the ships bunker program. Its partnership with the [      ] offers exceptional value and should also mitigate the risk of problems and provide for a seamless transition from a paper based, labor intensive environment to an automated electronic system. In addition, MSC immediately brings to the table AIR Card acceptance at [  ] locations, as well as SEA Card acceptance at [ ] Marine seaports. No other offeror, including [      ], offered this immediate acceptance at so many air and sea locations .... For discounts, [    ] provided examples of existing discounts that will be instantly available at contract award, including an average discount of [      ] a gallon, rising to [          ] at Air [ ] locations[.]

*Id.* at 129 (emphasis added).

### 3. [      ] **Ratings.**

The SSAs assigned [      ] a Satisfactory technical rating. *Id.* at 126. The SSAs noted several strengths in [      ] proposal, including:

its extensive database of fuel and service providers at airports worldwide; worldwide recognition and acceptance of the [            ]; a comprehensive customer database ... and a 24/7 help desk staff. It offers several methods for processing transactions electronically .... [        ] also has an aggressive airfield discount and acceptance program. It provides data edit checks and the capability to pay a vendor and bill the customer simultaneously. Its backup system is robust with an extensive disaster recovery plan. Its security structure is comprehensive and complies with [DoD] requirements .... It maintains *strong* relationships with banking institutions, including revolving lines of credit to deal with fluctuations in billing cycles and pre-payments to suppliers and merchants[.]

*Id.* at 126–27.

[      ] proposal, however, also had problems:

While the SEA Card was addressed, the primary focus of [      ] technical proposal seemed to be on the [      ], which we consider a weakness in its proposal. In general, its proposal lacked the detail evident in [        ] proposals. There were other weaknesses. Its [      ] system can only be used for [      ] contract transactions for [      ,] and they currently have only [ ] locations in the United States with these [  ] terminals. The [      ] states that the [            ] will take over a year to refine and go live. Its Quality Assurance Surveillance Plan did not address all SOO objectives in great detail. In addition, although it intends to leverage its successful [          ] experience to obtain acceptable agreements and discounts, [      ] apparent lack of experience with marine fuel suppliers, and its proposal's focus on [        ], could prove problematic with the start up of the SEA Card program. [      ] proposal states they will aggressively pursue acceptance at commercial seaports, but does not offer a comprehensive solution other than to state that the SEA Card will automatically be accepted at contract locations. They propose to work aggressively utilizing the same procedures currently utilized under the [        ] program for acceptance at non-contract locations.

*Id.* at 127.

[  ] received a "Very Good" past performance rating:

[  ] performance in providing the first credit card program for [        ] division is the major factor in determining their past performance rating. It is also our opinion that [    ] has provided very good customer support under the [            ].... However, the [  ] written proposal did not contain a "brief description of the work" except to state [            ] and customer point of contact information. The past performance proposal information did not enhance the proposal's past performance evaluation.

*Id.*

[  ] received a "Satisfactory" socioeconomic subcontracting rating, but the SSAs noted that "[  ] has not exceeded the statutory small business procurement goals for Federal agencies for this solicitation." AR at 127.

As to [    ] price, the SSAs explained:

Of the four offers, [            ] prices were the two highest received, $[    ] and $[    ] more than MSC respectively, and $[    ] and $[    ] more than [    ] respectively. Based on their proposal, combined with their higher priced offers, we are eliminating [    ] and [    ] from further consideration. It is not in the government's interest to pay the price premiums associated with these proposals, particularly in light of the numerous strengths and benefits associated with MSC's and [    ] higher rated and lower priced proposals.

*Id.* at 129.

On September 23, 2004, DESC awarded Contract No. SP0600–04–C–0427 ("the Contract") for both the AIR and SEA Card Programs to MSC. *See* AR at 131. AVCARD disputes all the SSA's findings in a protest pending at the GAO. *See* Compl. ¶ 11; AR at 210–20.

### 4. Transition Efforts.

On August 5, 2004, DESC notified Into–Plane contractors that, although the current AIR Cards had expiration dates of September 30, 2004, the AIR Card Contract had been extended through December 31, 2004. *Id.* at 310. DESC also advised Into–Plane

contractors that [  ] agreed to accept the expired AIR Cards through December 31, 2004. *Id.* On August 5, 2004, DESC sent a similar letter to AIR Card Accountable Officials,[7] informing them that DESC would notify vendors to accept the expired cards through December 31, 2004. *Id.* at 311.

At the request of DESC, MSC has been engaged in preparing to assume performance responsibility on January 1, 2005 since Contract No. SP0600–04–C–0427 was awarded September 21, 2004. *See* MSC Stat. of Facts at ¶¶ 42–55; MSC Stat. of Facts Exh. 1 at ¶¶ 13–26. For example, MSC began notifying merchants with whom it had existing agreements about the proprietary MS Aviation Card and co-branded cards. *Id.* In addition, MSC entered into contracts at [ ] new DESC locations to pursue and negotiate contracts to accept the MSC AIR Card. *Id* at ¶ 15.

At DESC's Worldwide Energy Conference held from September 27–30, 2004, MSC representatives provided handouts to over 1,675 attendees, introducing MSC as the new AIR Card and SEA Card provider, describing the approach that MSC developed for each Program. *Id.* at ¶¶ 16–17. In addition, MSC distributed materials and spoke to conference attendees, including: pilots; refueling personnel; approving officials; and officers from each branch of the U.S. military. *Id.*

MSC also has assembled a team of [ ] full-time employees, including computer programmers and analysts, to implement the AIR and SEA Card Programs, effectuate transition, upgrade existing point-of-sale machines, and develop data collection software. *Id.*

Other contract implementation steps completed to date include:

- October 12 through 14, 2004—MSC representatives attended the annual convention of the National Business Aircraft Association, met with fuel companies to add the AIR Card to their network, and spoke to cardholders and merchants regarding the card;

---

7. AIR Card Accountable Officials are individuals designated by AIR Card holders to report any

questionable purchases and certify for payment unquestionable purchases.

- October 19, 2004—[     ] and MSC formulated a [     ] competitive bidding process for marine fuel pricing;
- November 4, 2004—MSC mailed correspondence to [     ] domestic and international merchants to direct them to cease acceptance of the [     ] AIR Card on December 31, 2004, and thereafter only accept the new MSC AIR Card;
- November 9, 2004—MSC spent $[     ] to purchase [     ] point-of-sale devices to upgrade terminals in the field. MSC also designed new product code stickers, manuals, and help sheets to accompany these devices;
- November 11, 2004—MSC finalized its instructional booklet to accompany each AIR Card. Upon DESC's approval, MSC sent the booklet to a subcontractor for printing;
- November 12, 2004—MSC received credit card stock and provided the stock to a sub-contractor to emboss [     ] new AIR Cards;
- November 15, 2004—MSC mailed a second letter to [     ] domestic and international merchants to reinforce previous correspondence to cease acceptance of the [     ] AIR Card on December 31, 2004, and thereafter only accept the MSC AIR Card. Enclosed with the notice was an enrollment form for merchants to acknowledge their acceptance of the MSC AIR Card as of January 1, 2005; and
- November 16, 2004—MSC notified all of the approximately [     ] MSC merchants, [     ] direct MS Aviation Card merchants, Air [] international locations, and international fuel and non-fuel partners ([     ] merchants) of the expiring [     ] AIR cards and the exclusive use of the new MSC AIR cards.

*Id.* at ¶ 20.

After the award of Contract No. SP0600–04–C–0427, MSC representatives met with and provided technical details about the AIR and SEA Card Programs to Card Program Managers and FBO Territory Managers from such major oil companies as: [     ]. *Id.* at ¶ 21. In fact, MSC is working with [] Group to implement the SEA Card program and create software to service the approximately [] SEA Cards issued to vessels worldwide. *Id.* at ¶ 24. MSC employees also have been working with the fuel providers to answer technical questions, schedule software certification, and ensure that MSC's cards are accepted electronically. *Id.* These companies also have begun preparations for transition to the MSC AIR Card, including briefing employees and coordinating technical, financial, and marketing support for their FBO network. *Id.* at ¶ 22.

MSC also has ordered [     ] paper ticket blanks to distribute in mid-December 2004 to vendors that have not received an Electronic Point–of–Sale ("EPOS") System. *Id.* at ¶ 23. The SEA Card will utilize an intranet order management system, rather than an EPOS system similar to that utilized by the current AIR Card. *Id.* at ¶ 25. MSC is in the process of completing all the required programming and has secured over [     ] locations to accept the SEA Card in addition to the approximately [     ] contract locations for marine fuel. *Id.* MSC and [] plan to conduct training programs and travel to specific ports to train personnel on proper SEA Card processing. *See* MSC Stat. of Facts Exh. 1 at ¶ 25. MSC further has engaged in a significant amount of technical programming and planning to build the system in order to set up the infrastructure necessary to begin contract performance on January 1, 2005. *Id.*

### PROCEDURAL BACKGROUND

#### A. AVCARD's Post–Award Bid Protest.

On September 29, 2004, DESC conducted a post-award debriefing at AVCARD's request. *See* Compl. ¶ 10; AR at 210. On October 4, 2004, AVCARD timely filed a notice and post-award bid protest with the GAO challenging the award of Contract No. SP0600–04–C–0427 to MSC; the GAO timely provided notice of the protest to DESC.[8] *Id.*

---

8. To stay performance of a contract pending resolution of a bid protest by GAO, the federal agency awarding the contract must receive notice of the protest:

The GAO's notice then triggered the automatic stay of performance provision, set forth in the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3553(d)(3)(A),[9] pursuant to which the GAO must determine the merits of a protest within 100 days from the date it was filed. *See* 31 U.S.C. § 3554(a)(1); *see also* 4 C.F.R. § 21.9(a) (requiring the GAO to "issue a decision on a protest within 100 days after it is filed."). In this case, that date is January 12, 2005.

In the GAO proceeding, AVCARD has alleged that: DESC unreasonably penalized AVCARD for its "purported emphasis" on the AIR Card, which represents [ ] percent of the fuel purchase transactions under the Contract; DESC's consideration of fuel savings was inadequate, unreasonable, and inconsistent with the Solicitation; and DESC's failure to consider the reach of AVCARD's network of locations at which it is accepted was inconsistent with the evaluation criteria. *See* AR at 213–17.

### B. The Defense Energy Support Center's Override Decision.

On October 7, 2004, the Director of DESC issued an Authorization to Continue Performance to override the CICA stay as it was determined to be "in the best interests of the United States to have [MSC] continue performance under the terms of the new contract."[10]   AR at 222, *see also* 31 U.S.C.

§ 3553(d)(3)(C). Therein, the following findings were made:

> The AIR and SEA Card [P]rograms are essential . . ., allowing aircraft and vessels to efficiently refuel at commercial airports and seaports. Without the AIR Card, pilots will be forced to return to paper-based local purchases . . . at non-contract locations. At contract locations, where the card is an electronic data capture device and payment mechanism, the government will return to non-electronic processing. . . . This is costly and inefficient, prone to mistakes, misunderstandings, and dissatisfied customers and vendors alike. Without implementation of the SEA Card, the Government will be forced to continue the existing process of manual (paper based) purchases of ships bunkers fuel, at significant expense.

> \*     \*     \*     \*     \*     \*

> As it currently stands, with [    ] contract expiring on December 31, 2004 and a stay on performance of the contract awarded to MSC, DESC will not have any contract coverage for the AIR Card as of January 1, 2005. Further, the [   ] contract does not provide for SEA Card services at all. GAO's decision is due January 12, 2005. Because of the importance of the programs, continuation of the stay means that DESC must either extend [   ] contract again until March 31, 2005 and hope that MSC is ready to begin performing on April

---

beginning on the date of the contract award and ending on the later of (A) the date that is 10 days after the date of the contract award; or (B) the date that is 5 days after the debriefing date offered to an unsuccessful offeror for any debriefing that is requested and, when requested, is required.
31 U.S.C. § 3553(d)(4).

**9.** If the Federal agency awarding the contract receives notice of a protest:
> in accordance with [section 3553] during the period described in paragraph (4)—
> (i) the contracting officer may not authorize performance of the contract to begin while the protest is pending; or
> (ii) if authorization for contract performance to proceed was not withheld in accordance with paragraph (2) before receipt of the notice, the contracting officer shall immediately direct the contractor to cease performance under the contract and to suspend any related activities that may result in additional obligations being

incurred by the United States under that contract.
31 U.S.C. § 3553(d)(3)(A).

**10.** The head of the procuring activity may authorize:
> the performance of the contract (notwithstanding a protest of which the Federal agency has notice under this section)—
> (i) upon a written finding that—
> (I) performance of the contract is in the best interests of the United States; or
> (II) urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest; and
> (ii) after the Comptroller General is notified of that finding.
31 U.S.C. § 3553(d)(3)(C).

1, or award AVCARD a sole-source "bridge" contract from April 1 to April 12, 2005. Alternatively, DESC can override the stay and continue the 90–day transition, with performance by MSC to begin January 1, 2005. Overriding the stay and allowing MSC to continue its transition efforts would cost less than further extending AVCARD's contract on January 1, 2005 for an additional three and a half months ... to allow for the contractual transition period to a new contractor. The cost to the Government of further extending AVCARD's contract through April 12, 2005 is $[      ] and this only includes AIR Card services, without providing any coverage for the SEA Card. By contrast, continuing the transition and allowing MSC's contract performance to begin January 1, 2005 for the same period will cost approximately $[       ] and will provide both AIR and SEA Card services[.]

A further consideration is that the AVCARD issued AIR Cards currently in circulation expired September 30, 2004, and although the activities and vendors were notified that these cards should still be accepted until December 31, 2004, transactions are being denied by some vendors. If performance is stayed, activities and vendors will have to be notified again that the cards, though expired, should still be accepted through sometime in April 2005. This additional period will likely generate [        ].

In addition to these costs, continuing the stay will further delay implementation of the SEA Card program until mid-April 2005. It will also increase Government costs in relation to the SEA Card. In addition to the man-hour resources devoted to processing these paper transactions, DESC incurs charges of $[   ] per voucher from Defense Finance and Accounting Service (DFAS) for processing these paper transactions. Using historical data from FY 2004, ... DESC could incur additional processing charges from DFAS of approximately $[   ] by continuing the stay on performance.

*Id.* at 223–24 (footnotes omitted).

Based on these findings, the Director of DESC concluded:

*It is in the Government's best interests* to continue performance under MSC's new contract since performance under the new contract will enable DESC *to provide necessary support to both aircraft and naval vessels* at less cost than extending AVCARD's contract for the AIR Card. Further, continuing with performance enables DESC to begin implementation of the SEA Card program, thereby reducing the amount of resources required to process purchases for ships bunkers fuel.

*Id.* at 224 (emphasis added).

## C. Proceedings Before The United States Court Of Federal Claims.

On November 5, 2004, AVCARD timely filed a Complaint in the United States Court of Federal Claims to: declare that DESC's decision to override the stay imposed by CICA was "arbitrary and capricious," *see* Compl. (Prayer for Relief) ¶ 1; enjoin DESC from allowing performance of any contract, issued pursuant to Solicitation No. SP0600–04–R–0026 until AVCARD's protest at the GAO is final, *id.* at ¶ 2; and attorneys fees and costs. *Id.* at ¶ 3.

On November 5, 2004, AVCARD filed a Motion for a Preliminary Injunction and a Memorandum in Support. *See* Pl. Mot. for Prel. Inj; Pl. Br. On November 8, 2004, MSC filed a Motion to Intervene. *See* MSC Mot. Int. On November 16, 2004, the Government filed an Opposition to AVCARD's Motion for a Preliminary Injunction. *See* Gov't Opp. On November 16, 2004, MSC filed: a Motion for Summary Judgment on the Administrative Record; an Opposition to AVCARD's Motion for Summary Judgment; and a Statement of Material Facts Not in Dispute regarding both of the aforementioned. *See* MSC Mot. for S.J. On November 19, 2004, MSC filed a corrected Motion for Summary Judgment on the Administrative Record. *See* MSC Cor. Mot. for S.J.

On November 19, 2004, AVCARD filed a Counter–Statement of Facts in response to MSC's Statement of Material Facts. *See* Pl. Stat. of Facts. On that date, AVCARD also filed a Cross–Motion for Summary Judgment on the Administrative Record, together with

a Statement of Additional Facts. *See* Pl. Cross–Mot. S.J.; Pl. Stat. of Add'n. Facts.

On November 29, 2004, MSC filed redacted copies of a corrected Motion for Summary Judgment on the Administrative Record, a Consolidated Motion for Summary Judgment on the Administrative Record, and Opposition to AVCARD's Motion for a Preliminary Injunction, together with a Statement of Material Facts Not in Dispute.

On December 1, 2004, the court conducted a five hour oral argument on the pending motion. On December 7, 2004, AVCARD's Motion for a Preliminary Injunction was withdrawn, rendering the Government's Opposition moot. Therefore, AVCARD's Cross–Motion for Summary Judgment on the Administrative Record and MSC's Motion for Summary Judgment on the Administrative Record are the only motions pending for adjudication.

## DISCUSSION

### A. Statutory Authority For An Agency Override Of The Automatic Stay.

Congress authorized the head of a federal agency to override the automatic stay provision of 31 U.S.C. § 3553(d)(3)(A)(ii) by:

authoriz[ing] the performance of the contract (notwithstanding a protest . . .)—

(i) upon a written finding that—

(I) performance of the contract is in the best interests of the United States; or

(II) urgent and compelling circumstances that significantly affect the interests of the United States will not permit waiting for the decision . . . concerning the protest[.]

31 U.S.C. § 3553(d)(3)(C); *see also* 48 C.F.R. § 33.104(a)-(h).

### B. Jurisdiction.

■ Pursuant to the Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, 110 Stat. 3870, Congress authorized the United States Court of Federal Claims with exclusive federal jurisdiction to adjudicate four separate and distinct causes of action, where an "interested party" objected to:

- "a solicitation by a Federal agency for bids" or
- "proposals for a proposed contract" or
- "a proposed award or the award of a contract" or
- "any alleged violations of statute or regulation in connection with a procurement or · a proposed procurement[.]"

28 U.S.C. § 1491(b)(1). The provisions of 28 U.S.C. § 1491(b)(2), (b)(3), and (b)(4), that follow 28 U.S.C. § 1491(b)(1), impose limitations on this grant of jurisdiction.

First, regarding relief, the United States Court of Federal Claims may "award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2).

Second, in exercising jurisdiction, the court "shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action." 28 U.S.C. § 1491(b)(3).

Third, any review of "the agency's decision" is to be made "pursuant to the standards set forth in section 706 of title 5." *See* 28 U.S.C. § 1491(b)(4). The plain meaning of the introductory language of Section 706, the judicial review provision of the Administrative Procedure Act ("APA"), Pub.L. No. 89–554, 80 St. 392, (1966), provides an additional consideration relevant to the United States Court of Federal Claims exercise of jurisdiction:

*To the extent necessary to decision* and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.

5 U.S.C. § 706 (emphasis added).

■ Therefore, as a threshold issue, the court must determine whether it is "necessary . . . [to] decide all relevant questions of law." *Id.* In making this determination in the context of 28 U.S.C. § 1491(b), Congress specifically instructed the United States Court of Federal Claims to "give *due* regard to the interests of national defense and na-

tional security." 28 U.S.C. § 1491(b)(3) (emphasis added). Given the priority and placement of this mandatory language within the overall structure of 28 U.S.C. § 1491(b), the court has determined that, where legitimate "interests of national defense and national security" have been asserted and established to the court's satisfaction,[11] it is "not necessary" for the court to reach the merits of whether 31 U.S.C. § 3553(d)(3)(C)(i) was violated "in connection with a procurement[.]" 28 U.S.C. § 1491(b)(1). The court is not holding that an agency override decision is not justiciable,[12] nor that, in all cases where "interests of national defense and national security" are asserted, the court should not exercise jurisdiction. Indeed, there have been occasions in the history of our country where legitimate "interests of national defense and national security" have been raised and established, but the exercise of the court's jurisdiction was essential to maintaining constitutionally protected separation of powers among the three branches. *See, e.g., Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 613–14, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). Instead, the court has determined that where legitimate "interests of national defense and national security" are raised and established to the court's satisfaction, the

circumstances under which the United States Court of Federal Claims should find it "necessary" to reach the merits of an override decision should be the exception, rather than the rule. As the Honorable Lawrence J. Block of this court warned in *Overstreet Electric Co. v. United States,* 59 Fed.Cl. 99 (2003):

> In these times of heightened security at home, as well as lethal hostilities overseas, it is appropriate for the court to weigh in its calculus that the nation can ill afford any temporary, let alone permanent, weakness in national security.

*Id.* at 118–19 (citing *Yakus v. United States,* 321 U.S. 414, 440, 64 S.Ct. 660, 88 L.Ed. 834 (1944)).

## C. Standing.

Assuming *arguendo,* that AVCARD would be successful in obtaining a *mandamus* or winning an appeal to remand this case to the court prior to January 12, 2005, the date when the GAO decision on the substantive merits of AVCARD's bid protest will be issued, the court next would be required to adjudicate AVCARD's standing. In the court's judgment, AVCARD has established that it is an "interested party" under 28 U.S.C. § 1491(b)(1); *see also American*

---

11. *See, e.g.,* AR at 130 ("[the] *critical nature* of the AIR and SEA Card program") (emphasis added); AR at 222 ("[the] services provided by this contract [No. SP0600–04–C–0427] are *critical to DESC's mission* in support of the military services[.]") (emphasis added); AR at 223 ("The AIR and SEA Card programs are *essential programs,* allowing aircraft and vessels to efficiently refuel at commercial airports and seaports. Without the AIR Card, pilots will be forced to *return to paper-based* local purchases, using the SF 44 at non-contract locations.... Without implementation of the SEA Card, the Government will be forced to continue the existing process of manual (paper-based) purchases of ships bunker fuel at significant expense.") (emphasis added); AR at 224 ("If performance [of the new contract is enjoined it] ... will likely generate only further confusion, card rejection and interruption of a *critical program.*") (emphasis added); AR at 294 ("We would like to emphasize that we are coming down to crunch time and we have numerous aircraft deployed around the world fighting the war on terror and we are concerned that they will be refused fuel service because they don't have the correct credentials."); AR at 296 ("Please consider this justification for the Department of Navy to have available a credit card

as payment mechanism ... for the purchase of fuel and/or ground services at commercial airports by January 2005[:] The war fighter will have to pay the posted vendor price per gallons of fuel [twice] the standard DESC contract price, this will reduce ... flying hour dollars and will have a drastic affect [sic] on their mission.").

12. *See* Judith A. Sukol, "The Competition In Contracting Act's Automatic Stay Provision And Judicial Review: A Trap For The Unwary," 43 Admin L. Rev. 439, 445 (Summer 1991) ("Sukol") (distinguishing *Webster v. Doe,* 486 U.S. 592, 601, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988), which held that Section 102(c) of the National Security Act ("NSA") committed employee discharges to the CIA Director's discretion from the Competition in Contracting Act, unlike the NSA does not "exude deference."); Robert M. Hansen, "CICA Without Enforcement," 6 Geo. Mason L. Rev. 131, 146–48 (Fall 1997) (same); *cf. Universal Shipping Co. v. United States,* 652 F.Supp. 668 (D.D.C.1987) ("To establish protest procedures and to make a stay of a protested contract automatic in all but extraordinary circumstances is to display a suspicion of agency fairness altogether at odds with foreclosure of judicial review.").

*Fed'n Gov't Employees, AFL–CIO v. United States,* 258 F.3d 1294, 1302 (Fed.Cir.2001) ("We hold that standing under [28 U.S.C.] § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract.").

The United States Court of Appeals for the Federal Circuit has not addressed whether, in the context of a motion to set aside or enjoin an override of the automatic stay issued, under 31 U.S.C. § 3553(d)(3)(C), "prejudice" must be demonstrated to establish standing, *i.e.*, that the protestor would have a "substantial chance" of receiving the award absent the alleged error in the procurement process. Assuming *arguendo* that a protestor has standing to bring a bid protest, it would seem that the standing requirement to challenge an override should not be any higher. Such a determination, however, does not end the court's inquiry since panels of the United States Court of Appeals for the Federal Circuit have taken different approaches regarding the evidence required to satisfy the "substantial chance" doctrine in a bid protest case. *Compare Information Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.2003) (a protestor must establish "that its chance of winning the award was 'greater than ... insubstantial ... if successful on the merits of the bid protest.' "); *with Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed. Cir.1999) (holding that a protester is not required to show that, but for the alleged error, the protester would have been awarded the contract; instead a protester must show there was a "substantial chance" it would have received the contract but for the alleged error); *with Data General Corp. v. Johnson,* 78 F.3d 1556, 1562–63 (Fed.Cir. 1996) (holding "the appropriate standard is that, to establish prejudice, a protestor must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protestor would have been awarded the contract. This is a refinement and clarification of the 'substantial chance' language[.]"); *cf. United States v. Int'l Bus. Machines Corp.,* 892 F.2d 1006, 1011 (Fed.Cir.1990) ("[O]nly the sec-

ond-lowest bidder has a direct economic interest in the award of the contract. Therefore, only the second-lowest bidder is an interested party entitled to protest the award of the contract, ... because only it stands to receive the contract in lieu of the challenged awardee[.]") (internal citation omitted). Assuming *arguendo* that the highest "prejudice" standard would be applicable because of the "interests of national defense and national security" considerations of 28 U.S.C. § 1491(b)(3), AVCARD could not meet that standard since it was not, in fact, the second lowest bidder. *See* AR at 120.

**D.   The Relevant Standards Of Review.**

■   Although the court has decided in this case that it was not "necessary" to "decide all relevant questions of law," the court spent considerable time reviewing the standard of review argued by the parties in this case and the standard utilized in other recent decisions of the United States Court of Federal Claims, and offers these observations.

The jurisdiction of the United States Court of Federal Claims in a stay override case is to "render judgment" regarding whether there has been a "violation of statute [*i.e.,* 31 U.S.C. § 3553(d)(3)(C) ] or regulation in connection with a procurement or a proposed procurement[.]"   28 U.S.C. § 1491(b)(1). Assuming *arguendo,* that the court has decided that it is "necessary" to decide all relevant issues of law, the APA provides six standards under which a court shall hold:

unlawful and set aside agency action, findings, and conclusions [, *i.e.,* where they are] found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory rights;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the

record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial *de novo* by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and *due account shall be taken of the rule of prejudicial error.*

5 U.S.C. § 706(2) (emphasis added).

In *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415–17, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the United States Supreme Court set forth a precise and detailed analysis of the appropriate "standards" of review to be applied by a court reviewing agency determinations. First, the court must ascertain whether the agency "acted within the scope of [its] authority." *Id.* at 415, 91 S.Ct. 814; *see also* 5 U.S.C. § 706(2)(C). Second, the court must determine that "the actual choice made [by the agency] was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* at 416, 91 S.Ct. 814 (quoting 5 U.S.C. § 706(2)(A)). Under the latter standard, the court must determine "whether the decision was based on a consideration of the relevant factors and whether there has been a *clear error of judgment." Id.* (emphasis added). Therefore, in agency override cases, the court must first determine whether the head of the agency's decision to issue an override was within the scope of its authority under 31 U.S.C. § 3553(d)(3)(C) and, if so, whether, based on the relevant facts to *that* decision (not the underlying procurement official's decision to award the contract or procedure utilized), there has been "no clear error of judgment." *See* SUKOL at 448–49 (discussing the applicability of the standards of review utilized in *Overton Park* to agency override determinations).

Many of the recent decisions of the United States Court of Federal Claims have not analyzed agency override determinations, pursuant to the standards of review discussed in *Overton Park,* but instead have utilized a much less stringent standard. *See, e.g., Chapman Law Firm v. United States,* 62 Fed.Cl. 464, 466 (2004) (emphasis added) ("[T]he issue that must be resolved is whether there exists a *rational basis* for the ... override[.]"); *Altos Group Inc. v. United States,* 60 Fed.Cl. 832, 833 (2004) (emphasis added) ("The question ... is whether the agency considered the relevant factors and made a *rational determination*."); *Keeton Corrections, Inc. v. United States,* 59 Fed.Cl. 753, 759 (2004) (emphasis added) (*"no valid basis* for the override of the automatic stay has been shown to exist."). The source of the "rational basis" or "rationally based" standard is in two important decisions of the United States Court of Appeals for the Federal Circuit. *See Banknote Corp. of America, Inc. v. United States,* 365 F.3d 1345, 1348 (2004) (where the principal issue was "whether the contracting officer applied the proper standards when evaluating bids in a 'best value' procurement") and *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed.Cir.2001) (holding "all bid protest actions under the APA are now reviewed under the standards applied in the *Scanwell* [*Labs, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970)] line of cases.").

*Banknote* and *Impresa* discussed the standard of review applicable and relevant to *Scanwell* cases, wherein standard of review concerns a procurement official's decision to award a bid. Where the United States Court of Federal Claims is exercising jurisdiction over an objection to "a proposed award or the award of a contract," under 28 U.S.C. § 1491(b)(1), the "rational basis" characterization of the 5 U.S.C. § 706(2)(A) standard is applicable. In cases concerning an agency override, however, the court is exercising jurisdiction over "any alleged violation of statute or regulation in connection with a procurement," under 28 U.S.C. § 1491(b)(1). Moreover, in light of the specific "interests of national defense and national security" limitation on the exercise of jurisdiction set forth in 28 U.S.C. § 1491(b)(3), the court has determined that the appropriate standards of review are those set forth in the two part test in *Overton Park,* requiring that the court determine there was "no clear error of judgment" by the agency authorizing an

override.[13]  This higher standard is particularly appropriate where an injunction is sought to end an override.

The court is mindful that agency override opinions of the United States Court of Federal Claims rarely will be subject to appellate review because of the limited time period of the stay's effect.  Nevertheless, reconsideration of the appropriate standard of review is warranted because Congress only recently vested this court with exclusive jurisdiction to adjudicate override decisions, in part, to better insure uniformity in the application of the standard of review and analysis than had been the situation when United States District Courts throughout the country shared this jurisdiction.  *See* SUKOL at 449 ("[D]istrict courts' findings in the area of availability of judicial review under the CICA have been difficult to reconcile, so too have the decisions actually applying judicial review.")

## CONCLUSION

For the reasons set forth herein, the Clerk of Court will enter a final judgment that: Plaintiff's November 19, 2004 Cross Motion for Summary Judgment on the Administrative Record is denied;  Defendant–Intervenor's responding Cross Motion For Summary Judgment is denied as moot;  and all other motions filed with the court in this action have been withdrawn or are moot.

**IT IS SO ORDERED.**

---

13.  The court would be less than candid if it did not advise the Director that an internal review of the process by which the October 7, 2004 Authorization was issued should be considered. Since Congress has determined "interests of national security" are currently at risk, the court found the lack of any mention of the effect of S.J. Res. 23 in the Authorization striking.  Moreover, the Director should be aware that post-authorization justifications, *e.g.*, AR at 294; AR at 296, would have been disregarded by the court, if the merits had been reached.  *See Overton Park*, 401 U.S. at 419, 91 S.Ct. 814 ("'[P]ost hoc' rationalizations ... have traditionally been found an inadequate basis for review[.]").  In the issuance of any necessary future overrides the court would commend to the Director and agency counsel the guidance found in SUKOL at 452–54.